STATE OF MISSOURI ex rel. STATE HIGHWAY COMMISSION, Appellant, v. HARRY A. CLEVENGER and HETTIE J. CLEVENGER, Respondents, No. 45056—291 S. W. (2d) 57.

Division Two, May 14, 1956.
Motion for Rehearing or to Transfer to Banc Overruled, June 11, 1956.

*Robert L. Hyder, Ralph H. Duggins* and *Minor C. Livesay* for appellant.

*Robert F. Sevier* and *William E. Turnage* for respondents.

[58] EAGER, P.J.—The State Highway Commission, as relator, instituted condemnation proceedings to acquire lands in Clay County for the relocation of a portion of Highway 69 as a limited access highway. We are concerned here only with the land and interests of Harry A. Clevenger and his wife. They were awarded $4,400 by the commissioners, filed timely exceptions, and were thereafter awarded $15,000 by a jury. The relator has appealed. For convenience, the parties will be referred to as relator and defendants. We have jurisdiction because of the amount involved.

Defendants owned a farm of 176.38 acres in a somewhat irregular shape; it is bounded on the west by Fishing River, on the south largely by the old channel of that river (it having been diverted at that point in a previous highway project), and on the east by a county road. The north boundary is immaterial here. The drainage on this farm was largely to the south. No farm buildings have been physically disturbed. The old Highway 69, a two-way route, bordered the farm on the south for a distance of approximately 150-200 feet, extending westerly from the east line to a ditch. The Highway Department has, as indicated in the petition, established Highway 69 at this point as a limited access highway, using the old route for eastbound traffic and establishing a new roadway for westbound traffic; the latter lies north of the old road, and runs generally northeast and southwest. For this project relator has appropriated 9.27 acres of defendants' land for the new right of way and for a relocation of the county road; in addition, 1.38 acres are to be used under a temporary construction easement for a "borrow-pit." The strip thus taken for the new roadway is approximately 2,000 feet in length and includes a drainage easement north of the roadway, extending from the relocated county road to the west line of the property. A drainage ditch will run along this easement to the old channel of Fishing River, defendants' westerly boundary. No culverts are provided under the new roadway. Approximately nine acres of defendants' land are left between the old and new roadways of the highway. These nine acres are also bisected by the relocated county road, which now runs southwesterly from a point on defendants' east line for approximately 1,000 feet (north of the new roadway, but within its right of way), thence across the new roadway and southerly to a point where it intersects the old roadway of Highway 69 at defendants' south line. The relocated county road serves as an access road for defendants' property throughout its entire

length, but access to the highway proper is otherwise denied defendants, as specified in the condemnation petition. The new westbound roadway is approximately 5 to 6 feet above the ground level of defendants' adjacent land, and the relocated county road gradually slopes downward from that roadway, reaching the old ground level at its intersection with old 69. It was agreed that 220 rods of new fencing would be required to separate defendants' remaining land from the highway. The numerous other details of the construction need not be mentioned.

Defendants had owned and occupied this farm for many years. There was wide divergence in the testimony on valuations, both as to the value of the land taken and the damage to the land remaining; or, putting the matter in another way, in the difference between the fair and reasonable market value of the land before and after the taking. We cannot go into the details of all this testimony. The witnesses for defendants fixed the total damages at figures varying from $11,800 to $20,990; these witnesses (aside from defendant Harry Clevenger) were nearby real estate dealers and neighboring farmers. They fixed the original value of the farm at figures varying from $44,000 to $52,800. Two of relator's witnesses fixed the total [59] net damages (considering special benefits) at $2,294.50 and $2,960, respectively, and the other testified that defendants derived a net benefit of $2,230. Apparently defendants' witnesses thought there were no resulting special benefits. The disparity in the resulting views of the total damages was caused in part by the completely opposite views as to the value of the nine acres left between the two roadways and also bisected by the new county road. Defendants' witnesses attributed to this tract a greatly depreciated value, while relator's witnesses thought it now very valuable as commercial property because it would presumably be available as a site for one or more filling stations, and perhaps for other commercial development; they explained that such improvements could (subject to a re-zoning) be constructed at the access point where the county road intersected the new west roadway, though necessarily they would face the county road. We find it unnecessary to discuss the details of this controversy. One witness for relator, employed by an oil company, testified specifically that in his opinion the nine acre tract was worth $8,500 after the new construction, because of the limited number of access sites available. Defendants' witnesses emphasized the obstruction of the drainage and the possibility of flooding, the necessity of new fencing, the inconvenience of farming the separated tracts and of passage between them, the limitation of access to the new highway, and the good quality of the land taken. Other features of the evidence will be discussed hereinafter.

■ One of the points made here by appellant, and certainly not the least important or troublesome, is that the court erred in permit-

ting defendants' witnesses to testify to an item of damage resulting from the "limitation of access" from defendants' land to the new route of the highway, and in submitting this to the jury as an element of damage. As a corollary, relator also insists that the court erred in refusing its Instruction A, which would have instructed the jury that it might not consider any limitation of defendants' right of access to any part of the highway not in existence at the time of the appropriation. This raises a question new to the jurisprudence of Missouri, and one which is relatively new elsewhere. We shall discuss all those cases cited by relator which we deem sufficiently in point.

We note first that § 29, Art. IV, Mo. Const., 1945, gives to the State Highway Commission full "* * * authority * * to locate, relocate, * * maintain * * construct and reconstruct state highways, * * and * to limit access to, from and across state highways where the public interest and safety may require, subject to such limitations and conditions as may be imposed by law." The powers of the Highway Commission are set out generally in Chapters 226 and 227, RSMo 1949, V.A.M.S. In the case of State ex rel. State Highway Commission v. James, Banc, 356 Mo. 1161, 205 S.W. 2d 534, this court held: that the power of eminent domain was inherent in sovereignty; that under the above constitutional provision and the existing statutes the Commission had full power to condemn easements in land for rights of way, and also to extinguish easements of access held by abutting owners, which in themselves were interests in land; that the aforesaid provision declared that such limitation of access was a proper subject for, and purpose of, condemnation proceedings, subject to such limitations as the general assembly might impose. That case is of little specific help on our present question, for the actual decision there merely required the circuit court to accept and exercise jurisdiction of all the issues thus tendered, including the power of the Commission to limit access by condemnation. The admeasurement of damages was not actually an issue in this court. The court did say: "Existing law, both statutory and constitutional, already limit and condition the taking of any interest in land by providing that just compensation must be ascertained and paid in the manner provided by statute." From the opinion it is difficult, to say the least, to compare the factual situation of the property [60] owners there with that of the defendants in the present case; this fact will be further demonstrated in the following discussions. The authorities there relied on would seem to indicate that what the court had in mind was the extinguishment of an existing easement of access to an existing roadway.

Essentially, the Commission contends that since the new westbound roadway was never in existence, actually or potentially, until the appropriation was made, defendants could not possibly have had any previous right or easement of access to it; and, since the right of access was restricted by the very same appropriation, no easement of

access ever arose, except as permitted thereby; further, that such supposed and nonexistent right of access was a wholly improper element of damage to the land remaining.

This principle has been adopted in several California cases, although the facts therein differ somewhat from ours. Thus, see: Schnider v. State. (Calif. Sup.), 38 Calif. 2d 439, 241 P. 2d 1, City of Los Angeles v. Geiger, 94 Calif. App. 2d 180, 210 P. 2d 717; People v. Thomas, 108 Calif. App. 2d 832, 239 P. 2d 914. Those cases hold generally that if there was no roadway adjacent to defendant's premises in which he had an easement of access prior to the appropriation, then the appropriation and limitation effected no disturbance of an existing right; and that there was no loss which would constitute special damage. Another California case held that there was no damage for the disturbance of an existing easement where access was thereafter allowed along an outer service road (People v. Schultz, 123 Calif. App. 2d 925, 268 P. 2d 117), although California apparently recognizes the right to compensation for the extinguishment or substantial impairment of an existing easement of access (People v. Loop, 127 Calif. App. 2d 786, 274 P. 2d 885). Defendants say that these California cases are inapplicable because based upon a "peculiar statutory construction." The statutes (Dearing's California Codes, Streets and Highways, Vol. 1, § 100.1 et seq.) authorize the construction of "freeways," and the making of any existing highway into a freeway; also, (§ 100.3) they declare that a declaration creating a freeway shall not affect previous rights of access, and that any such rights taken or damaged shall be acquired as provided by law. The Schnider case, supra, merely held that the latter section referred only to rights which existed prior to the establishing of the freeway. We see nothing peculiar in this construction which would make the principle of the California cases inapplicable.

In the case of State, By and Through State Highway Commission v. Burk, 200 Ore. 211, 265 P. 2d 783, this question arose under circumstances very similar to ours; the relocated, nonaccess highway ran through defendants' land, separating it into two tracts. The trial court instructed the jury that at the time of the appropriation the defendants had no right of access, that the state was not taking any easement, and that no damages should be allowed for the loss of any such supposed right of access. A statute permitted the condemnation of "any and all rights of access" in highway proceedings, upon determination of the damages. The Supreme Court of Oregon held that since the statute did not apply exclusively to the acquisition of new land for nonaccess highways, it did not show an intent that payment need be made in all cases, although payment should be made where an existing easement in an existing road is condemned. It further held: that the proceedings there did not create, and then immediately extinguish, an easement of access; that Oregon law only

required compensation for the taking of an existing easement and here there was none, and consequently no taking; that there was no servient tenement, as required for the existence of an easement, at the time of the appropriation; and that the situation was substantially the same as though defendants had sold this strip of land to a private individual, in which event they would retain no easement of access. To this extent the court followed, generally, the California [61] cases. But it held, further, that although no special item of damage could be allowed where there was no existing easement to be taken, nevertheless, the jury might consider the nonaccess character of the highway on the issue of the damage to the property remaining, and because, by its very nature, this appropriation might be a "more complete severance." In the course of the opinion, the court said in part, (265 P. 2d, l. c. 794-5, 796): "Our conclusion that there was no easement of access and that none was condemned is not decisive of the further question as to whether the non-access character of the highway was relevant on the issue of consequential or severance damages to the remaining property. The effect which the unique and total character of the condemnation may have upon the market value of the property not taken, presents an issue which is not dependent upon the existence of an easement. We again quote from the article in Stanford Law Review, cited supra:

" 'As a final case, consider the situation where the right-of-way purchased runs right through B's land. In the case of a normal, unrestricted-access highway, B will be paid for the land actually taken and also "severance" damage for the separation of the property. If the highway is to be of limited-access design, with B having no right of access, the severance of the two parcels will be more complete. B should be, and is, paid for this more complete severance, but this is on the basis of severance damage alone and not on any theory of right of access being denied.' 3 Stanford Law Rev., Freeways, p. 308.

" '* * * In any event, whether the market value of the land not taken was affected by the 'more complete severance' resulting from the character of the highway appropriated, was a question to be determined by the jury upon the evidence. * * * *

" '* * * It follows that the damages awarded to a landowner may include an element of loss by reason of a depreciation in the market value of the remaining land by reason of the peculiar nature of the appropriation." We do not regard any differences between the cited Oregon Statutes (as there construed) and the Missouri law as controlling. In Carazalla v. State of Wisconsin et al., 269 Wisc. 593, 71 N.W. 2d 276, the Supreme Court of Wisconsin discussed and followed generally the Burk case, supra, though apparently regarding the limitation of access as an exercise of the police power.

As indicated in the Burk opinion, there are two law review articles containing instructive discussions of limited access highways, their desirability, and the legal implications to adjacent owners. See: 3 Stanford Law Review 298 (1951); 27 Wash. Law Review 111 (1952); and see also the earlier article in 13 Mo. Law Review 19, which is more in the nature of a forecast of things to come. The purport of these (and particularly of the Stanford article) is: that an adjacent owner is ordinarily entitled to compensation for the extinguishment of an easement of access to an existing road, but with a possibility of no damage if he is given a service road; where a new freeway is established adjacent to one's land and access concurrently denied, the landowner never had an easement of access, and no compensation should be awarded; if such freeway goes through the land, he has lost no access rights to a highway, but the severance may thus be more complete and the severance damage greater, and this should be considered, but not upon the theory of a denial of or loss of access. The author of the article in 27 Wash. Law Review 111, regards the restriction of access as merely taking away "the value which the construction of the road created." (l.c. 123)

Some authorities hold that there is no special damage for the deprivation of access to a freeway, as such, if reasonable access is provided by way of a service or outer roadway, although this access be somewhat more circuitous. Carazalla v. State of Wisconsin et al., 269 Wisc. 593, 71 N.W. 2d 276; People v. Schultz, 123 Calif. App. 2d 925, 268 P. 2d 117; State ex rel. Merritt et al. v. Linzell, 163 Ohio St. Rep. 97, 126 N.E. 2d 53; 27 Wash. Law Rev. 111.

[62] The cases of Burnquist v. Cook, 220 Minn. 48, 19 N.W. 2d 394; Smick et al. v. Commonwealth et al. (Ky.), 268 S.W. 2d 424, and Rothwell v. Linzell, 163 Ohio St. Rep. 517, 127 N.E. 2d 524, cited by relator, do not appear to be material to our precise question. In St. Louis Electric Terminal Ry. v. MacAdaras, 257 Mo. 448, 166 S. W. 307, also cited, it was held that a landowner, defendant in condemnation proceedings, had no right to additional damages based upon an enhanced value of his property due to the construction of the improvement itself. That principle, while somewhat analogous, is not directly in point here.

As we construe the record, defendants made no claim for any loss of access to the old roadway of Highway 69, being the eastbound lane, which was adjacent to the south end of their farm for a short distance. The relocated county road now joins the eastbound lane there. The matter was mentioned at least once, casually, but no witnesses were asked concerning a supposed valuation, and no such item was included in Instruction No. 2 explaining defendants' theory of damages. If such a claim was in the case at all, it was abandoned. It is entirely possible that the access to the south along the relocated county road is substantially as good as it was previously. We

shall disregard that feature as a possible element of damages and we specifically call attention to this.

We are, therefore, interested only in the claim for damages for limiting defendants' access "from defendants' land * * to certain portions of said westbound lane." In the evidence there was much confusion, both in questions and answers, between the supposed right of *access to the road,* and the *inconvenience* of access from one part of the farm to the other, after the location of the new highway. Certain of the witnesses were apparently thinking, in part, of the latter element, but the transcript specifically shows that some of the witnesses testified that the loss of access to the road was worth $1,000; when this first occurred, the court sustained an objection and struck out the evidence as an improper element of damage; shortly thereafter, however, the court reversed this ruling, and specifically so instructed the jury. Thereafter, both in hypothetical questions and in specific questions to defendants' witnesses, this element was included and in the answers it was considered. Instruction No. 2, given at the request of the defendants, told the jury that it might take into consideraion in determining the damages, if any, the limitation of access to the westbound lane of the highway, in addition to the separation of the different tracts, and the inconvenience of getting from one part of the farm to another. It is clear that the supposed taking of an easement of access was thus included and stressed as a specific element of damage in addition to such other elements.

We approve the view expressed in the case of State, By and Through State Highway Commission v. Burk, 200 Ore. 211, 265 P. 2d 783; there could be here no taking of an easement of access to the new roadway, because no prior right of access existed; thus, the supposed deprivation of a right of *access to the road* itself could not constitute a compensable element of damage. But we further hold that evidence of the manner, nature and extent of the taking, the separation of defendants' land into different tracts, and the added inconvenience, if any, in going about the farm, may properly be considered by the jury in assessing the total net damages to the land, together with any other similar circumstances. And, certainly, evidence of the presence of the new roadway, the modes of access provided, the relocated county road, and the reasonably probable uses of the remaining property, may and should be considered in determining the question of special benefits, if any, to defendants.

This ruling, we think, is not out of harmony with the decision in State ex rel. State Highway Commission v. James, Banc, 356 Mo. 1161, 205 S.W. 2d 534. At another trial the jury will presumably consider the entire taking, balancing what defendants owned prior to the appropriation against what they own thereafter, and will compensate them in full for the difference in fair market

value, less any special benefits. Since the element of access to the road was so thoroughly injected into this case as a [63] specific and additional item of damage, we deem it necessary to reverse and remand the case for retrial. It is impossible to say what the verdict of the jury would have been upon a trial conducted as suggested herein. This is apparently the first instance in which our appellate courts have been required to determine this particular question, and since it will presumably arise in hundreds of cases hereafter, we feel that a specific and logically correct rule should be established.

■ From what we have said it necessarily follows that Instruction No. 2, given for defendants, was erroneous; relator also contends that it was erroneous because it listed various elements of damage in argumentative fashion. Except for the inclusion therein of the element of limitation of access, a very similar instruction was approved in the case of State ex rel. State Highway Commission v. Haid et al., Banc, 332 Mo. 606, 59 S.W. 2d 1057. A somewhat similar instruction was held erroneous in Kansas City, C.C. & St. J. Ry. Co. v. Couch, Mo., 187 S.W. 64, but that case is distinguished in the Haid case; another, somewhat analogous, was held erroneous in State ex rel. State Highway Commission v. Day et al., 226 Mo. App. 884, 47 S.W. 2d 147, but that ruling was distinguished in State ex rel. State Highway Commission v. Caruthers, Mo. App., 51 S.W. 2d 126. See also: Siemers v. St. Louis Electric Terminal R. Co., 348 Mo. 682, 155 S.W. 2d 130, 137; Shell Pipe Line Corp. v. Bruns, Mo. App., 239 S.W. 2d 546, 553. At another trial counsel may be guided by the other criticisms of this instruction and the authorities cited by relator, if so advised, for it seems that these objections might rather easily be remedied.

■ At the trial one of relator's witnesses, Gerald G. Green, a real estate dealer, produced and presented a written contract to purchase for $7,500 the 9.246 acres of defendants' land lying between the westbound and eastbound roadways; he had executed this as the proposed purchaser, but he had not previously presented it to the defendants. He also presented a cashier's check for $1,000, the down payment recited in the contract. This witness was examined largely out of the presence of the jury, he stating that he was then openly making the offer, though admitting a little later that he had made no investigation of property values on that highway and in that vicinity. On objection that the offer had not previously been communicated to defendants and that it did not tend to prove the reasonable value of the land, the offers were excluded. Relator insists that this was error, though admitting that "oral and not binding" offers are inadmissible as evidence of value, because easily made and refused and easy of fabrication. Missouri Public Service Co. v. Hunt, Mo. App., 274 S.W. 2d 27, 31; City of St. Louis v. Gerhardt Realty Co., 328 Mo. 103, 40 S.W. 2d 661. The purpose here, of course, was to establish a substantial

valuation for this tract, and, in part, to rebut the depreciated values given by defendants' witnesses. The insistence now is that this offer was not hearsay and that it was made in binding form. The only Missouri case which plaintiff cites, Metropolitan St. Ry. Co. v. Walsh, 197 Mo. 392, 94 S.W. 860, merely held that evidence of an offer by the defendant to sell his property for a certain sum was admissible as an admission against interest, contrary to the general rule of exclusion of offers. We need not examine the cases cited from other states. In School District of Clayton v. Kelsey, 355 Mo. 478, 196 S.W. 2d 860, it was held that a fully executed but unconsummated contract for the sale of neighboring property was inadmissible; the court said that to admit such would open the door to contracts made in bad faith. We agree with this rule of exclusion. Such offers and contracts are susceptible of improper use even though bona fide in a given case. Defendants here had no opportunity to investigate the person making this offer or his status, and the contract was certainly not one made or negotiated in the usual course of business. The offer was properly rejected.

It will not be necessary to consider in detail relator's assertions of error in the [64] admission of evidence, but a few suggestions may be appropriate in view of a retrial. The principal claim is that the court erred in permitting defendants' counsel, after he had asked complete hypothetical questions on valuations before and after the appropriation, to ask some of his witnesses if they had taken into consideration certain specific items of damage, such as fencing and loss of access, and in permitting answers placing values on such items; it is further claimed that this tended to build up the damages and to cause an assessment of "double damages." This was apparently done upon the theory that these witnesses were "confused." Some of this evidence was likely to be misleading; counsel did not establish a foundation for cross-examination on the ground of surprise. A witness may properly be asked to explain how he arrived at a total valuation given, or at the difference in valuations before and after, thus permitting him to explain what items he considered; indeed, counsel for relator followed this course in their cross-examination. Defendants suggest that the total damages fixed by the respective witnesses thus involved were in each instance less than the verdict of the jury. It would be difficult to say, and we need not determine, whether this evidence resulted in any double damages or constituted reversible error. It further appears that the trial court received at one point in evidence a stated valuation of $600 per acre on the 9.27 acres of land taken which the witness said he fixed *because* the land was being taken for road purposes. The court rejected similar evidence from other witnesses and the reception mentioned was probably inadvertent. That basis of valuation is improper, as the court recognized and stated.

In view of the action now taken, it is wholly unnecessary to pass upon the contention that the verdict was so excessive as to indicate bias and prejudice. The judgment will be reversed and the cause remanded for a new trial in accordance with the views expressed in this opinion. It is so ordered. All concur.