**STATE of Missouri ex rel. STATE HIGH-WAY COMMISSION of Missouri, Appellant,**

v.

**Eugene HERMAN et al., Exceptions of William E. Thomson, et al., Respondents.**

**No. 51514.**

Supreme Court of Missouri, Division No. 1.

July 11, 1966.

Motion for Rehearing or for Transfer to Court En Banc Denied Sept. 12, 1966.

Robert L. Hyder, Jefferson City, Earl H. Schrader, Jr., Tom J. Helms, Kansas City, for appellant.

Harry P. Thomson, Jr., John R. Caslavka, Kansas City, for respondents, Shughart, Thomson & Kilroy, Kansas City, of counsel.

HOUSER, Commissioner.

To facilitate the construction of Interstate Highway I–70 State Highway Commission in 1959 filed a petition to condemn a tract of 2.18 acres in Jackson County, part of a larger tract of approximately 22 acres. On February 29, 1960

commissioners appointed by the circuit judge filed their report awarding landowners damages of $1,750. The case was tried to a jury on exceptions filed by the commission and the landowners. The jury awarded damages of $35,000. The commission has appealed. Landowners' estimates of damages ranged from $61,500 to $240,000. The commission's witnesses testified to damages of from $1,090 to $2,200. We have jurisdiction of this appeal since the amount in dispute exceeds $15,000. State ex rel. Kansas City Power & Light Co. v. Salmark Home Builders, Inc., Mo.Sup., 350 S.W.2d 771; Constitution, Art. V, § 3, V.A.M.S.; § 477.040, V.A.M.S.

The commission's first point is error in sustaining landowners' motion at the close of the evidence to direct the jury as a matter of law that as a result of the taking landowners were left without access to the remaining 20 acres. Landowners claim that the value of the remaining 20 acres has been diminished to virtually nothing because it is landlocked as a result of the construction of Interstate I–70. The commission claims that the remaining acreage is not landlocked and that landowners are entitled to be compensated only for the value of the 2.18 acres taken.

The 22-acre tract lies south of Highway 40, north of Leeds Road and west of Manchester Trafficway. For many years prior to the taking access to the 22-acre tract was had from the north via Eastern Avenue, a public road running generally north and south. Eastern Avenue was established by order of the county court in 1873. Its right of way was obtained by condemnation and paid for by public funds. Eastern Avenue was originally traversible for its entire length from Highway 40 on the north

to Leeds Road on the south. Access to the 22-acre tract was cut off from the north by the construction of Interstate I–70. In 1915 a bridge on Eastern Avenue south of the 22-acre tract and north of Leeds Road broke down and was never rebuilt. Over the commission's objections landowners introduced the testimony of ten witnesses showing that because of the breakdown of the bridge Eastern Avenue from the 22-acre tract south to Leeds Road has not been passable and has not been used since 1915.

Proceeding south along the west property line of the 22-acre tract Eastern Avenue changes its generally north-south course at a point within the 22-acre tract, from which it runs southeast to Leeds Road. Prior to 1957 the west part of the 22-acre tract lay within the city limits of Kansas City, and the east part lay in Jackson County. In 1957 the city limits were extended to include the entire tract. The 22 acres are underlain with a total of 2,260,997 tons of limestone of commercially saleable quality. That portion of Eastern Avenue south of the 22-acre tract was located outside the city limits of Kansas City until 1957.

The commission contends that the ruling of no access as a matter of law was mistakenly based upon inadmissible testimony— the testimony of nonuser. This testimony was admitted on the basis of the last clause in § 228.190, V.A.M.S.[1]

On this appeal it is not the position of the commission that in declaring the property landlocked as a matter of law the court erred by depriving the jury of the opportunity of passing upon the credibility of the 10 witnesses who testified to nonuser. Tacitly and impliedly conceding the fact of non-

[1] "All roads in this state that have been established by any order of the county court, and have been used as public highways for a period of ten years or more, shall be deemed legally established public roads; and all roads that have been used as such by the public for ten years continuously, and upon which there shall have been expended public money or labor

for such period, shall be deemed legally established roads; and *nonuser by the public for five years continuously of any public road shall be deemed an abandonment and vacation of the same.*" (Our italics.) In 1953 the nonuser period was changed from ten to five years. Laws 1953, p. 674.

user, the commission's complaint is that the court erred in admitting evidence of non-user as a basis for landowners' theory of damages. The commission conceded in the pretrial hearing that access *from the north* was cut off by the construction of Interstate I–70. At the trial and on this appeal the commission did not contest the fact of nonuser after 1915 of the portion of Eastern Avenue *to the south.* In appellant's brief it is conceded that landowners "affirmatively showed" that after the bridge broke down in 1915 the use of the portion of Eastern Avenue south of the 22-acre tract was intermittent at best "and amounted to virtually no use at all."

The commission contends that the non-user provision of § 228.190 applies only to county roads established by prescription or user, and is inapplicable to roads such as Eastern Avenue and may not be used to justify the admission of evidence of abandonment, because Eastern Avenue was acquired by condemnation and paid for by the expenditure of public funds. The commission argues that abandonment of Eastern Avenue could properly be shown only by an order of vacation adopted in compliance with §§ 228.110–228.130, V.A.M.S., or by an ordinance of vacation adopted by the city, and that no such order or ordinance was made or adopted. The commission reasons that the public roads provisions of Chapter 228, V.A.M.S., envision a complete, symmetrical procedure for both establishment and vacation of county roads; that they provide for the filing of a petition or application, the giving of notice, the holding of a hearing, and the making of an order of establishment, § 228.080, or vacation, § 228.110; that the closing of a county road must be effected by a formal order of vacation having equal dignity with a formal order of establishment, and that since the right of way for Eastern Avenue was condemned and paid for by public funds, and not procured by gift or by payment of the amount of the damages by the petitioners, abandonment may not be effected under § 228.190.

We are of the opinion that a thoroughfare such as Eastern Avenue, legally established originally as a county road, used and existing as a public road for many years thereafter, which falls into disuse and is not used by the public for ten years continuously from 1915, may be declared abandoned and vacated under the nonuser clause of § 228.190. The nonuser clause in positive terms is made applicable to *any* public road, "however acquired." Johnson v. Rasmus, 237 Mo. 586, 141 S.W. 590, 591 [2]. It does not exclude or except public roads paid for by public funds and acquired by condemnation and we find no basis for a construction so limiting it. Nonaccess from the south by reason of that part of Eastern Avenue having ceased to exist could be established in this case by either of two methods: formal vacation by an order of the county court under § 228.110, or abandonment under § 228.190, i. e., nonuser by the public for the statutory period continuously. Landowners were not required to produce a formal county court order of vacation in the abandonment of the public road. Corbin v. Galloway, Mo. App., 382 S.W.2d 827 [4]; State of Missouri ex rel. Carter County v. Lewis, Mo. App., 294 S.W.2d 954; Odom v. Hook, Mo. App., 177 S.W.2d 165; McEneny v. Gerlach, Mo.App., 142 S.W.2d 1095; Rosendahl v. Buecker, Mo.App., 27 S.W.2d 471 [4]; Proctor v. Proctor, 222 Mo.App. 21, 4 S.W.2d 882; Oetting v. Pollock, 189 Mo. App. 263, 175 S.W. 222. As stated in Elliott on Roads and Streets, 3rd ed., Vol. 2, § 1172: "a highway may cease to exist either by abandonment or by vacation according to law." The testimony of the several witnesses showing nonuser of the portion of Eastern Avenue in question was admissible in evidence. That testimony amply justifies the finding of abandonment of that portion of Eastern Avenue between the 22-acre tract and Leeds Road and effectively establishes that landowners' access to their land from the south has been cut off for many years.

■ It is true, as suggested by the commission, that the nonuser provision of § 228.190 was not intended to apply to title of lands voluntarily conveyed in trust to be used for the purpose of establishing streets thereon as they shall be needed and that lands so dedicated in perpetual trust and platted for such purposes can only be abandoned by an act as deliberate as that by which they were acquired, that is, by proceeding under § 228.110, Robinson v. Korns, 250 Mo. 663, 157 S.W. 790; Bobb v. City of St. Louis, 276 Mo. 59, 205 S.W. 713; Winschel v. County of St. Louis, Mo.Sup., 352 S.W.2d 652, and to this extent the ruling in Johnson v. Rasmus, supra, has been limited. Nothing in the last three cited cases militates, however, against our present ruling, which is made upon fundamentally different facts.

■ The commission, in an attempt to contradict landowners' claim that the remaining 20 acres is landlocked, offered to prove that Sloan-Wilbert Vault Company, a corporation owning land immediately abutting on the south side of the 22-acre tract, was willing to sell and would then and there at the trial offer to sell to landowners sufficient ground to enable them to build a road connecting their land to that portion of Eastern Avenue which was still legally and physically open, for $2,000, by which landowners could obtain access to the remaining 20 acres. The offer was refused. The commission contends that in so ruling the court erred; that a condemnee has a duty to mitigate damages by taking any reasonable action to cure lack or loss of access caused by condemnation; that landowners could purchase this right of way and were under a legal duty to do so and build a road thereon. Pointing to evidence introduced by landowners showing that the construction of a road would cost $25,000, the commission argues that it would be better for landowners to spend $2,000 for right of way and $25,000 to construct a road, thereby restoring the value of the 20 acres remaining, than to "sit around and complain of their plight." This argument

is based upon landowners' testimony that the remaining acreage had been depreciated to the extent of from $61,000 to $240,000. The commission wishes to invoke the rule that "* * * when the reasonable cost of repairing the injury by restoring the premises to their former condition as near as may be is less than the diminution in the market value of the property by reason of the injury, such cost of restoration is the proper measure of damages. * * *," referred to in Smith v. City of Kansas City, 128 Mo. 23, 30 S.W. 314 and Reutner v. Vouga, Mo.App., 367 S.W.2d 34.

The commission is in no position to invoke this rule, which by its terms is applicable only to situations in which the cost of restoration is *less* than the diminution in market value. The commission admits that "it is obvious that the cost of curing or restoring the value of defendants' remaining land is $27,000" but insists that the diminution in market value is limited to $2,200 at the most. On the other hand, if we accept landowners' testimony that the cost of restoration is less than the diminution in market value, then it becomes obvious from the following computation that in awarding $35,000 damages the jury for all practical purposes adopted the measure of damages now advocated by the commission. There was testimony that the cost of restoration would include $22,000 for a bridge, fill and guard rails, $3,000 for engineering, $5,625 for building and surfacing a 450-foot road, and $2,000 for right of way, or a total of $32,625 as the cost of restoration. A commission witness testified that the 22-acre tract was worth $1,000 an acre, so the jury could find that the value of the 2.18 acres taken was $2,180. The total, $34,805, comes within a small percentage of coinciding exactly with the amount of the jury verdict of $35,000.

If nevertheless it be considered that the rule is available to the commission, the latter has not made a sufficient offer of proof to convict the trial court of error in its refusal. The commission offered to prove by Courtney Y. Sloan, a stockholder

in Sloan-Wilbert Vault Company, a closely held family corporation, that during the trial, the stockholders conferred among themselves and with their attorney and authorized Mr. Sloan to sell to landowners "a right-of-way off of the Thomson land, across all of the land or some of the land of [the corporation] up to where Eastern Road is now passable," for $2,000, and that the corporation would have sold such right of way to landowners in 1960 when the taking occurred. This offer was not communicated to landowners in 1960 or at any time prior to the fifth day of trial. There was no tender of a deed conveying a right of way. There were no minutes of the board of directors of the corporation authorizing such a sale. The offer was not made in the usual course of business but in the course of litigation, under the stimulus and stress of trial. Landowners were given no opportunity to investigate the bona fides of the offer, the authority of the agent, the financial responsibility of the corporation, the legal title of the corporation to the land over which the route was proposed or the physical conditions which would be encountered in building roads and bridges along the proposed route. Such offers are easily made and easily withdrawn or revoked. To admit an offer of this kind of evidence would open the doors to offers made in bad faith. We adhere to the rule excluding such offers, State ex rel. State Highway Commission v. Clevenger, 365 Mo. 970, 291 S.W.2d 57 [3, 4]; School Dist. of Clayton v. Kelsey, 355 Mo. 478, 196 S.W.2d 860, 863, and find no error in the action of the court in this respect.

The commission's last point is error in permitting landowners to introduce testimony as to the value of their land based upon its use as a rock quarry or mine. The commission points out that at the time of the taking 20 of the 22 acres were zoned R-1, residential, which does not permit the operation of a rock quarry or mine, and argues that there was a failure to prove the reasonable probability that the 20 acres

zoned R-1 would be rezoned M-2, industrial, to permit quarrying or mining or that the necessary permits for the use of explosives could be obtained, and because landowners failed to prove that there was a demand for the rock deposits located on their land, or a reasonable expectation of such a demand in the near future.

Under the ordinances of Kansas City in effect on the date of the taking quarrying and rock crushing were allowed in M-2 districts and underground mines or quarries were permitted in R-1 districts. Stephen Kelly, an employee of the city plan commission, testified that under the master plan for rezoning all annexed areas the property in question was designated heavy industry; that on the date of the taking there was a reasonable probability that this property would have been rezoned, if an application had been filed with the city to rezone the east part of the property from R-1 to M-2. On direct examination he testified that if it had been rezoned M-2, open-pit quarrying and mining would be allowed thereon. On cross-examination he testified that while it is not rare for the city plan commission to permit quarrying, notwithstanding commercial buildings and properties are located in the immediate area affected by blasting, the commission is cautious, and it is highly probable that the commission would restrict this M-2 use and not permit open-pit quarrying and blasting where, as here, there were trailers and greenhouses in the vicinity. He made it clear, however, that under existing zoning, and without rezoning, underground blasting operations could be performed on the property; that a "cave mine requiring heavy blasting" would not be restricted.

This was sufficient evidence for the jury to consider the value of the land based upon its use as a rock quarry and to find that there was a reasonable probability that the 20 acres remaining would have been rezoned M-2, and that landowners had the legal right without zoning changes to engage in a quarry operation on the west 180 feet of their land, dig underground to the

east and quarry and mine rock out from under the remaining acreage notwithstanding the latter was zoned R–1 for surface uses.

With respect to the prospect of securing permits to blast or mine, there was evidence from which the jury could find that blasting permits are issued generally and as a matter of course if the applicants are established and experienced mine operators, with the knowledge of how to handle explosives, and an acceptable bond is posted.

On the question of demand for rock, Frank Carswell, an experienced quarry operator, testified that there has been a shortage of crushed rock in Jackson County at times; that in 1960 and any other year there are many times when the present quarries in the area cannot furnish the quantity of material the market requires and that often he has been called upon to ship by railroad rock which could not be furnished by his competitors; that quarry operators have to call on each other to supplement their ability to deliver.

The commission bases its contention of failure of proof of demand for rock upon the testimony of one of the co-owners of the quarry who acknowledged that in another lawsuit he testified that at the time the quarry was purchased it was not economically feasible to open a quarry at that location because the market was "at a very low ebb, and is still at a low ebb due to the fact that there are too many quarries in operation at the present time in that particular vicinity" and that it would not be economical to open up this tract until his competitors had exhausted their supply of rock. This testimony does not compel a reversal of the judgment. This party explained that the site was deliberately held in reserve as a quarry because of then-existing market conditions, awaiting the time when there would be a price advantage in that particular area over other competitors due to location; that whereas the area where the property is located has not been well developed up to the present time it is now being developed at a very rapid pace; that within the next fifteen years that area will be developed faster than any other area in the Kansas City territory; that "within the next five years that whole country out there will be very greatly developed beyond the point of all our dreams." There was no failure of proof of a reasonable expectation of a demand for the underlying rock in the immediate future.

No error appearing the judgment is affirmed.

HIGGINS, C., concurs.

WELBORN, C., not sitting

PER CURIAM:

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

All of the Judges concur.