## BEAGLEY v. UNITED STATES GYPSUM CO. et al.

No. 7531. Decided September 25, 1951. (235 P. 2d 783.)

See 67 C. J., Waters, sec. 846.

*P. N. Anderson, James P. McCune,* Nephi, *Eks-Ayne Anderson,* Salt Lake City, for appellant.

*Critchlow, Watson & Warnock,* Salt Lake City, for respondents.

WOLFE, Chief Justice.

This case comes to the author upon reassignment. It was originally written by *Dunford,* District Judge, sitting as a member of this court. A majority of the court did not concur in his determination of the damages. Therefore, his opinion is published verbatim insofar as it relates to liabilty and the cross-appeal, but not as to damages.

This matter was before the Court previously, and was remanded for a new trial because the record upon the first trial failed to establish that the defendant, United States Gypsum Company, did or did not have the right to take its 1/6th interest in the water in question by shutting off the entire flow for 1/6th of the time. The facts presented upon the first trial are stated in the opinion, *Beagley* v. *United States Gypsum Co.,* 116 Utah 337, 209 P. 2d 750, and need not be repeated here except as repetition is necessary in determining the questions now before the Court.

After remittitur in the former hearing, a new trial was had before the Court without a jury, in which it was stipulated between the parties that the record made in the first trial could stand in this case subject to objections, and that the parties may present such additional competent evidence as they may desire.

Upon the new trial, evidence was presented to fill the shortage in the record which caused reversal upon the first appeal. At the conclusion, the trial court entered its Findings, Conclusions and Decree, awarding judgment to the plaintiff in the sum of $550.00. The plaintiff appeals, assigning errors which will be specified later in this opinion, and the defendant cross appeals.

As, by its cross appeal, the defendant challenges the sufficiency of evidence to support any judgment against it whatsoever, that matter will be first disposed of.

Preliminarily to consideration of any and all errors assigned by the parties, it should be pointed out that this is

an action at law for damages in which the trial court, without a jury, heard and determined the facts. In such a case, this Court may not reverse or modify the judgment unless the trial court has manifestly disregarded determinative evidence, or its conclusion in respect thereto is clearly against law. *Tuft* v. *Brotherson,* 106 Utah 499, 150 P. 2d 384; *Palfreyman* v. *Bates & Rogers Construction Co.,* 108 Utah 142, 158 P. 2d 132; *Beckstead* v. *Brinton,* 105 Utah 395, 142 P. 2d 409; *Tracy Loan & Trust Co.* v. *Openshaw Inv. Co.,* 102 Utah 509, 132 P. 2d 388; *Baker* v. *Wycoff,* 95 Utah 199, 79 P. 2d 77.

Defendant's cross assignments of error, briefly stated in substance, are as follows:

1. The evidence is insufficient to justify the Court's finding and conclusion that defendant's 1/6th interest in the water from Rowley Springs was a continuous flow and that defendant's turning down of the valve in the pipeline was in violation of 103-59-2, U. C. A. 1943.

2. The evidence is insufficient to support the Court's finding and conclusion that defendant's turning down of the valve in the pipeline proximately cause the cessation of the flow of water to plaintiff's turkeys.

3. The evidence is insufficient to support the Court's finding and conclusion that the plaintiff exercised reasonable care to minimize his damages.

In 1906, Nephi City Corporation made application to the State Engineer to appropriate all of the waters of Rowley Spring which are the waters in question here, and in December, 1907, the City acquired its pipeline and the landowner's claim to the spring. John W. Ord and Samuel G. Ord protested the application and their protest was duly answered. On October 11, 1912, the State Engineer issued his Certificate of Appropriation #84B, awarding to the applicant "the use of one-half (½) cubic feet of water per second," for use "from March 1 to December 1, inclusive,

of each year." In the meantime, it appears that the controversy between the City and the Ords was being collaterally waged outside the Engineer's office as the minute of the City Council for December 20, 1907 shows a report of the work done by a special committee in an effort to adjust the differences. The portion of the report touching defendant's first assignment is as follows:

"That John W. Ord and Samuel G. Ord are willing to take in full satisfaction of their claim, *one-sixth of the flow of water continuously and one-sixth of the increased flow which may be developed by Nephi City upon their lands.*" (Emphasis added.)

The report was approved by the Council and the Mayor was

"authorized and directed to execute in behalf of the City an agreement in writing with John W. Ord and Samuel G. Ord *in accordance with the terms of settlement embodied in the foregoing report of the committee * * *.*" (Emphasis added.)

Following, and on January 30, 1908, the agreement contemplated was entered into. The provision of which concerning the Ords' right to the Rowley Spring water is as follows:

"The said party of the second part (Nephi City) * * * covenants with said first party, to procure title from the State Engineer to said Rowley Spring, and upon delivery of the deed (to right of way for pipe line) to said second party by said first party, aforesaid, to convey to the said first party, (Ords) by good and sufficient deed, *an undivided one sixth interest of the waters of the said Rowley Spring. and an undivided one sixth interest to any and all waters that may be developed* upon the said lands of said first party, * * * the said one sixth interest of said waters to be diverted from the pipe line of the second party, at a point where the said pipe line crosses the bottom of the canyon, upon said lands." (Emphasis added.)

After receipt of the Certificate of Appropriation, Nephi City executed to one George O. Ostler, who, according to the recitals contained in the instrument, had succeeded to

the rights of the Ords, a conveyance of the waters, which conveyance is in the following language:

"Nephi City, a municipal corporation, hereby conveys to said George O. Ostler *an undivided one sixth interest of in and to the waters* from Rowley Spring, the same to be diverted etc. * * *; and there is also hereby conveyed to said George O. Ostler *an undivided one sixth interest in and to any and all waters* which may hereafter be developed upon said lands by said Nephi City, its successors and assigns." (Emphasis added.)

In subsequent conveyances of land and water from Ostler to William L. Ellerbeck and from Ellerbeck to Nephi Plaster and Manufacturing Company, the water is described as "one-sixth (1/6) of the waters of what is commonly known as the John Rowley Spring." The defendant acquired the plaster company's right by deed dated December 5, 1938 "including the right to the use of one-sixth of the waters flowing from Rowley Spring."

The question upon cross appellants' first assignment is thus, whether the defendants' right to the use of 1/6th of the flow of the water was limited to a "continuous flow" so that by practically or completely shutting of the flow in the city pipe line, it violated the provisions of Sec. 103-59-2, U. C. A. 1943, and the rights of the plaintiff to the use of the waters, or whether such right was to the use of 1/6th of the water flowing in the City pipe line which might be rightfully taken by the defendant in alternate turns to the whole flow from Rowley Spring.

At some time between the date of the agreement between the City and the Ords, and 1921 or 1922, the exact date not appearing in the record, there was constructed near the mouth of the tunnel from which the Rowley Spring water flowed, a "headbox" enclosing a weir by which the waters of the spring were divided so that 1/6th thereof flowed through a pipe some distance from the weir and into troughs for use by the defendants' predecessors in interest in watering sheep.

Mr. George O. Ostler, who bought the land and water right from the Ords, testified that in 1921 or 1922, about a year before he purchased the property, he ran sheep thereupon and that during negotiations in 1923 or 1924 for purchase of the land and water, Mr. Ord took him up to this box, showed him the 1/6th division and told him that that would be his division and he took up troughs, connected them with the pipe from the breaker box and used the water for watering his sheep.

In 1925, a pipe line was installed from the defendant company's mine to, and was connected with, the City line from the spring. A valve was set in the city line at a distance 277 feet below the connection of the two lines, and by closing that valve, the water was backed up in the pipe the 277 feet to be carried through defendant's line to its mine. This valve was controlled by the City's superintendent of water. No effort was apparently made to use this valve to divide precisely the defendant's 1/6th interest in continuous flow. The valve was manually adjusted for the purpose of diverting to the plaster mine what water they needed which was "just a trickle" and only a small part of defendant's 1/6th of the total flow, as testified by Alfred J. Gowers, who superintended the City's water works for 37 years. At some time between 1921 or 1922 and 1925, and probably after defendant's pipe line had been constructed to its mine, a rock was placed in the weir within the "head box" in such a position as to divert most of the 1/6th flow from the pipe leading outside of the box and into "the well" within the box from which the City's line conducted the water down the mountain, and that rock remained there in somewhat different positions at least until 1943. Sometimes during that time a wooden plug was inserted into the pipe originally constructed to carry off defendant's 1/6th flow of the water.

The conveyance from Nephi City to the Ostlers does not specify the manner in which the respective parties of interest in the water were to use their rights. However, de-

fendant does not contend that the Court may not look to the relationship between Nephi City and defendant's predecessors or to writings and official records touching the relationship of the parties prior to such conveyance in order to determine the intention of the parties as to the manner in which such right is to be exercised. That the Court may inspect such former writings for the purpose of receiving light upon the question of intention, even though the later writing supersedes the first ones, but covers the same subject matter and where the later writing is a continuation of the former agreements was held by this Court in *Burt* v. *Stringfellow,* 45 Utah 207, 143 P. 234.

By examination of these former writings, and by considering the practical interpretation thereof by the parties as shown by the record, the uncertainty as to the manner of use by the holders of the right contained in the conveyance of that right by Nephi City becomes ■ clear, and we must and do hold that no error was committed by the trial court in its finding that defendant's right to the use of 1/6th of the flow from Rowley Spring was to be continuous, and that defendant was without right at any time to shut off from plaintiff more than that proportionate amount of the flow.

As to defendant's second cross assignment, the lower court was amply justified in finding that defendant had turned down the valve in the City pipe line, and that practically the entire flow of water was shut off for a considerable period of time, thus lowering the head ■ in plaintiff's head box to the point where the pressure was insufficient to keep the line clear and the meters in plaintiff's line operating and that they thereby became set because of normal rust and corrosion therein, and refused to resume operation when the head was finally restored in the "breaker box." Defendant, however, further contends that after the meters had been removed, cleaned and replaced, no water ran through the line until a wire had been run into the pipe and corrosion and some fibrous

materials were removed. This foreign matter, sufficient to continue a block in the pipe after cleaning of the meters, defendant contends, came there because an employee of the plaintiff got into the head box, removed a screen, plugged the city line with a sack, and thus himself stirred up foreign matter which was carried into plaintiff's pipe line.

Even if such fact were established by the evidence, it could not protect the defendant because his wrongful act had already been committed and the result, the shutting off of the water and the sticking of the meter discs, had already occurred. Plaintiff's efforts, if they did stir up sediment which got into the pipe, and there is no direct evidence that such occurred, were natural and reasonable, under his duty to use reasonable and ordinary means to minimize or overcome the damage. Such acts resulted naturally and proximately from defendant's wrongful act. Nothing in the record would justify a conclusion that plaintiff acted negligently or unreasonably in his attempt to force a flow into his pipe line by closing other openings from the "breaker box." All that is required of an injured party is that, after an injury, he use ordinary, reasonable and practical efforts to minimize his damages. 15 Am. Jur. page 424. *Jankele* v. *Texas Co.*, 88 Utah 325, 54 P. 2d 425. See also 25 C. J. S., Damages, § 32, p. 499. The question was before the trial court, it considered all of the evidence and found against defendant's contention, and its finding is supported by competent evidence. Its conclusion in respect thereto is thus binding upon this Court. *Farnon* v. *Silver King Coalition Mines Co.*, 50 Utah 295, 167 P. 675, 9 A. L. R. 248.

As to defendants' third cross assignment, the evidence amply establishes that during the time plaintiff operated his turkeys upon the property in question, there had been no interference with a steady stream until October 27, 1945, when defendant closed the valve in the City line. Prior thereto, by merely regulating his valve float in the troughs at the turkey farm, plaintiff could keep an ade-

quate supply of water. In the morning of that date, plaintiff's employee came to him and reported that the water to the turkeys was shut off. Plaintiff investigated for himself and came back to town to find the city watermaster. The watermaster could not be found. He then sent his father up to see what he could do while he continued his search for the city watermaster. He inquired of Bailey McCune Co., under whom he occupied the lands, to see if they had ever had such an experience, and made further search for help. He then went to the turkeys to ascertain whether his father had been successful in his efforts to free the water. He found his father returning from the region of the plaster mine. Plaintiff's father got a hack saw and cut off the lock on the "breaker box" to see if the trouble lay there and found that there was no flow of water into the box. While he was there, the water began to flow into the box, but by the time he had gone down to the troughs and back to the breaker box it had shut off again. Plaintiff's father then walked up to the spring where he saw water overflowing the "head box" and running down the canyon. He went then to the plaster mine where he saw Mr. Wright and told him the water was shut off, and was told that the defendant's employees had been testing the pressure of the water at the mine but that the water had been turned on. He then came down to the "breaker box" and found a "tiny drizzle of water coming in", so he went back to the mine to find defendant Downs, and unable to find him went to the City line and opened the valve. In the meantime plaintiff had continued his search for the City watermaster, or his assistant, until about 2:00 o'clock p. m. and his father not having returned, he went back up to the turkeys and his father went to lunch. After waiting a few minutes, he returned to town, and found the City watermaster about sundown. Immediately, the two of them went back up to the turkeys and Mr. Park took the meter apart. At that time there was water coming into the breaker box. After cleaning the meter, he reinstalled it and left. That work failed to reinstate the flow and he went back down

after Park. Mr. Park assured him that he could fix the water after he had done his chores and had supper. It was then dark and appellant went to a party but returned to the turkeys about midnight and slept there that night. He arose after daybreak and finding no water again returned to town for Mr. Park. When he returned to the turkeys Mr. Park was there. He then began searching for a tank to haul water to them and found one at about 9:30, but could not get the truck started. He then got a City sprinkling tank, filled it with water and drove up to the turkeys. At some time during these proceedings, the City line leading out of the breaker box was stopped off with a gunny sack in an effort to raise the head in the breaker box and thus to force the water through plaintiff's line.

Defendant contends that because plaintiff did not get a water tank to haul water to his turkeys earlier than he did, he did not act reasonably to minimize his loss. It certainly could not be said that he idly accepted the situation in view of this record. Furthermore, from the facts that appellant's line attached to the City line, that he paid a charge to the City for the use of the water, that the meters were owned, installed, controlled and read by the City, and that he leased the premises in question from Bailey McCune Co., it is most ordinary and reasonable that he should first seek to have the City discover and remove the cause of the stoppage. But plaintiff did not rest there. He immediately sent his father up to find and remove the stoppage, and as soon as he was able to find the City water man he had him go immediately to remedy the condition. It was logical for them both to assume on the night of October 27th that they had corrected the difficulty by removal of the top meter. In fact, the water then seemed to be coming into the pipe. It was dark at that time and the turkeys had settled down. He was up at daybreak and finding that no water had come in, first notified the watermaster and then sought means to haul water. Under these facts, the Court was amply justified in

holding that plaintiff had done all a reasonable person would have done under like circumstances, in order to minimize his loss. There is no merit to this contention.

The cross appeal is therefore denied.

The trial court in computing plaintiff's damage found that because of defendants' tort the plaintiff's turkeys lost 2,050 pounds of weight, that the average price per pound of turkeys was 36¢, but that plaintiff had saved $190.00 worth of feed, which subtracted from the gross damage would leave $548.00 and he awarded judgment for $550.00. Plaintiff excepts to this basis of determining the damage, asserting that it follows no known rule of law, and is not based upon any accepted formula for ascertainment of such damage.

The issue is whether the lack of water for 27 hours affected the final market weight of the turkeys. If it did, then the difference in weight between the plaintiff's turkeys and the average of all the normal flocks killed and graded at the Nephi Processing Plant would be a proper basis upon which plaintiff's damages could be computed. Defendant produced two expert witnesses to testify as to the damages. Doctor Lawrence Morris is Director of Producer Relations with Utah Poultry and Farmers' Cooperative. He received a doctor's degree in poultry nutrition and has spent the past 20 years teaching turkey nutrition and poultry management in Oklahoma, at the University of Wyoming and as Extension Poultryman at the Utah State Agricultural College. Given the facts concerning the deprivation of water to plaintiff's flock, he stated that the birds should go back to normal feed in less than a week's time.

"Question: And have you any opinion as to whether they will regain that lost weight, and gain so as to recover it?

"Answer: They would have fully recovered from that loss in body weight and be back up to the normal weight that they would have been.

"Question: That they would have been if they hadn't been interrupted?

"Answer: That's right.

"The Court: Just like—mind if I ask this question to clarify: If there is one pen of chickens alongside the others, and one misses water for 24 or 48 hours, the ultimate result is not going to be any different in either pen?

"Answer: That's right; that is—

"The Court: Go ahead.

"Question: Now, would the interruption of water in your opinion, for such a length of time—and at such a time in reference to their age and the climate, have any effect upon the grading of those turkeys according to the U. S. standards of grading?

"Answer: Those birds should have regained their lost body weight and been up within a very short time, and, as far as body weight is concerned, I can't see why they would be down in body weight; in other words I can't see any permanent injury to the bird due to this loss of water; if they had been weighed, if they had been killed within two or three or four days after the water was on, there would have been what we refer to as dehydrated, and they would have been shrunken to that extent."

Dr. Morris further stated that the feed that the birds ate when they flew out of their enclosure would have no permanent detriment if the feed wasn't too old or too tough, and that the breeding of the turkeys has as much influence on their ultimate weight as does the feeding and management of the birds.

Doctor Carroll Draper, head of the Poultry Department at the Utah State Agricultural College, also testified that no detrimental results would show after a week, to a flock of turkeys of the type and age here involved, after being deprived of water for 27 hours. The temperature range, the size of feeding lots and the diet of the turkeys up to the time the water was shut off were all taken into consideration.

Sufficient evidence supports the findings that the turkeys went off their normal feeding habits for a few days, not

exceeding one week. It is equally as important that this court accept the trial court's findings upon damages as well as upon liability where there is evidence to sustain such findings. The finding that during the time the turkeys were off their normal feeding habits, they would have gained 2,050 pounds of weight necessarily was arrived at in a somewhat vague manner. The burden of proof to establish the amount of damages rested upon plaintiff. The trial court chose to believe the defendant's experts instead of following the plaintiff's theory that the difference in weight at the time of marketing was caused by the defendant's wrongful act. Thus no specific formula to determine the damages incurred during the one-week period was presented. But considering plaintiff's witnesses, estimate that it takes five pounds of feed to put on one pound of live weight and that after the incident, the turkeys ate 1,000 pounds of feed less per day than they had been eating before, there is a factual basis upon which the trial court could find that the temporary loss in weight caused by the lack of water was 2050 pounds. This loss of weight at $.36 per pound equals $738.00, less $190.00 worth of feed not used, amounts to $548.00. The judgment for $550.00 will be affirmed. The evidence sustains the trial court's conclusion that the defendant's action in shutting off the water did not have a permanent detrimental effect in the weight of the turkeys at the time they were marketed. No exception is taken by defendant to the assessment of damages for the temporary loss of weight. Costs awarded to respondents.

WADE and McDONOUGH, JJ., concur.

DUNFORD, District Judge (dissenting).

I must dissent from that portion of the prevailing opinion which sustains the trial court's determination of the damages suffered by the plaintiff.

The rule that in a law case the appellate court will not disturb a trial court's judgment unless the latter has mani-

festly disregarded determinative evidence, or that its conclusion in respect to such evidence is clearly against law, is unquestionably sound. But I think that the converse of the rule is equally sound, viz., that when the trial court's judgment does disregard determinative evidence, or when its conclusions in respect to the evidence is clearly against law, the appellate court not only can, but should, make correction.

This case is somewhat unique in the respect that the defendants presented a theory based upon opinion evidence to the effect of the finding of the trial court and quoted in the prevailing opinion, while the plaintiff presented the theory of damages applied by this court to cases of trespass to growing crops. My disagreement with the prevailing opinion is fundamentally upon the applicable theory of damages when there is some evidence in the record to support each.

It is conceded in the prevailing opinion, as indeed it must be, that the finding

"that during the time the turkeys were off their normal feeding habits, they would have gained 2,050 pounds of weight necessarily was arrived at in a somewhat vague manner."

The law requires a claimant to present in the trial of his cause the best evidence which the nature of the cause permits him to obtain and to present. *Dubie* v. *Batani,* 97 Mont. 468, 37 P. 2d 662; *Landon* v. *Morehead,* 34 Okl. 701, 126 P. 1027; *Cushman Motor Works Co.* v. *Kelley,* 70 Okl. 208, 173 P. 1042; *School District No. 17, Rogers County* v. *Eaton,* 97 Okl. 177, 223 P. 857; *Shikany* v. *Salt Creek Transp. Co.,* 48 Wyo. 190, 45 P. 2d 645. If the law requires presentation of the best and most convincing evidence of a fact, it seems to go without saying that the court should consider and apply that evidence which, in view of the whole record, is the most certain and convincing. Nor can I believe the rule of support of law judgments by the appellate court, excuses this court from applying the best

evidence contained within the record, even though by doing so, it may reverse a cause and order a new trial, or the entry of judgment according to its conclusions upon the evidence, as the case may require.

To my mind, the court in this case was bound under *Naylor* v. *Floor*, 51 Utah 382, 170 P. 971, and *Spencer* v. *J. W. Summerhays & Sons*, 74 Utah 473, 280 P. 720, and upon the record made upon trial, to apply the rule of comparison between similar crops, similarly produced, upon similar lands and similarly marketed, less the cost saved by the tort of the defendants, because, in my judgment, the best evidence in the record supports that theory, and establishes the fallacy of the opinions of the experts that plaintiff's turkeys should have, and thus did, recover their lost weight and lost condition (except for 2,050 pounds of weight), prior to marketing.

The court has before it, duly presented and received, all of the "manifest sheets" upon turkeys processed at the Nephi processing plant during the season in which plaintiff's turkeys were marketed. It has before it in numerous instances, also, the description of the kind of turkeys, the ages of the turkeys, the kind of environment in which they were raised, the kind and amount of feed supplied, and the description of the manner of supplying water and care. These records contain the history of enough flocks without material variation from plaintiff's flock in any of these particulars, which marketed higher in both weight and classification, to convince my mind that the results of defendants' tort did in fact continue through, and affect the marketing, both as to weight and classification, and that acceptance of the testimony of experts against the facts so demonstrated, deprives the plaintiff of full restitution for the damage he suffered.

It would serve no proper public purpose for me to detail and apply the formulae which I used in following through the complications of a comparative analysis of the plain-

tiff's flock with other similar flocks. It is sufficient, in order to indicate that the question is of enough financial importance to the parties to warrant this special dissent (if quantum is a consideration), to state that in applying the comparative formulae, it appears to me that plaintiff should be awarded the sum of $4,650.34 instead of the $550.00 awarded by the trial court and approved in the prevailing opinion.

CROCKETT, J., being disqualified, did not participate therein.

HENRIOD, J., did not participate.