UTAH DEPARTMENT OF TRANSPOR-
TATION, Plaintiff and Respondent,

v.

RAYCO CORPORATION, Fashion Fabrics
of Utah Incorporated, Baskin-Robbins
31 Flavors Stores Realty Incorporated,
Johney Katich and Inza Katich, Jerald
V. Priest, Fred M. Stettler, and Commer-
cial Security Bank, Defendants and Ap-
pellants.

No. 15265.

Supreme Court of Utah.

July 26, 1979.

Robert S. Campbell, Jr. and Duane R. Smith, of Watkiss & Campbell, Salt Lake City, for defendants and appellants.

Robert B. Hansen, Atty. Gen., Stephen C. Ward, Asst. Atty. Gen., Salt Lake City, for plaintiff and respondent.

MAUGHAN, Justice:

Defendant Rayco, the owner of a shopping center and supermarket situated thereon, appeals from a judgment rendered in an eminent domain proceeding. Defendant seeks a new trial.

We reverse and remand for a new trial, in accordance with this opinion. Costs to

Rayco. All statutory references are to U.C.A. 1953.

The matter was tried before a jury, which returned a verdict of $99,963.65 for damages; of this, $38,028.00 was for the fair market value for the land taken, and $61,935.65 was for severance damages. Defendant made motions for an additur, or in the alternative, for a new trial. The trial court granted an additur of $37,714.35; of this sum, $10,800 was for improvements situated on the land taken, for which the jury failed to award any compensation. The remaining amount was to cover the minimum amount, as indicated in the evidence, to compensate for the cost of cure; a standard of recovery advocated by the state and adopted by the jury in lieu of severance damages. The plaintiff accepted the additur, and an amended judgment was entered. Defendant appeals and plaintiff cross appeals. The following diagram will be helpful in visualizing the facts and issues here involved.

Defendant's commercial property was situated in the downtown section of Ogden, Utah. It had 414 feet of frontage and access to 12th Street, and 180 feet of frontage and access to Washington Boulevard; both of which are major traffic arteries. As of June 7, 1976, the date of acquisition, the entire property was being utilized as a shopping center and supermarket. The improvements were situated on the northern boundary of the property; the parking area was immediately in front of it and extended to the southern boundary on 12th Street. The supermarket was located on the northeast part of the tract with unloading docks and employee parking situated next to the east property line. To the west of the supermarket, extending to the western boundary on Washington Boulevard, were three commercial rental units which were leased by a fabric store, a restaurant, and an ice cream store. The building occupied approximately 42,460 square feet of the property; most of the remainder of the 140,000 square feet of the property was utilized for parking.

[See following illustration.]

Property of Rayco Corporation

Total Property Before Condemnation 134,123 S.F.

Property Condemned by State

(i) In Fee Simple 16,901.2 S.F.

(ii) Drainage Easement 1,920 S.F.

Remaining Property After Condemnation 117,221 S.F.

Scale 1" = 80'

The prime parking area in the shopping center was directly in front of the supermarket, and extended to the entrances on 12th Street. It was uncontested that the highest and best use of the property was being made as of the date of service of summons. This use was directly dependent on adequate prime parking, which was extant prior to the taking. Without adequate parking, the supermarket could not compete with others in the vicinity. The supermarket was constructed in 1973; it was specially designed to facilitate the quick and easy movement of customers. The loading ramps were constructed parallel to the east wall of the building so the merchandise could flow to the storage areas on the north of the building and then to the retail sections in the central portions of the structure. The loading ramps had been so situated as to be away from the prime parking area so as to create a minimum of interference with the supermarket traffic.

The evidence established the economic patterns of the supermarket business, e. g., ordinary or daily sales and traffic do not yield more than a break-even result. It is only during "peak" hours that the property yields an acceptable return on the capital investment. The first five days of each month, and Thursday through Saturday, are "peak" shopping days for supermarkets generally in the Ogden area. To stimulate these "peak" periods, heavy reliance is placed on local advertising. To accommodate "peak" hour shoppers, it is imperative that adequate prime parking be available. The capacity of a supermarket to compete is directly tied to prime parking, the situs of which is directly in front of a supermarket. Parking on the sides or to the rear of the building is considered inadequate to meet "peak" demand hours. The evidence further indicated the chief competitors of defendant maintained ample prime parking to meet "peaking" requirements.

The customer parking area of the supermarket was designed to facilitate the entry and exit of traffic traveling in a north-south direction on 12th Street. The parking stalls for this traffic were aligned in an east-west direction directly in front of the supermarket. The parking area for the shopping center extended across the entire southern half of the property. Prior to condemnation, there were 228 parking spaces in the shopping center, of these approximately 30 to 40 spaces were situated along the east boundary and northeast corner of the property; these latter spaces were utilized for employee parking. There were six points of access to the parking area along 12th Street, and two points of access from Washington Boulevard. The parking spaces in the southwestern quarter of the property were situated in front of the other commercial enterprises.

The condemnation action was for the purpose of widening 12th Street. It included that taking of a strip 50 feet wide along the southern boundary of the property. In addition, the state acquired an additional 10 feet in depth for a drainage easement. The number of parking spaces was reduced from 228 to 158. The parking spaces condemned were primarily situated in the prime parking area. Furthermore, the number of access openings from 12th Street was reduced from six to three.

The evidence indicated the condemnation reduced the supermarket parking below the acceptable minimum. Thirty percent of the supermarket parking was taken. This resulted in the loss of more than 50 percent of the prime parking, directly in front of the supermarket. The minimum number of parking places required to accommodate a major shopping center, such as defendant's, is 212. There is no method by which the remaining parking area could be redesigned to compensate for the parking stalls lost. The remaining parking area can no longer accommodate "peak" customer traffic; thus defendant can no longer compete with the prime parking of its competitors. The narrow band of parking remaining could reasonably cause traffic congestion and inconvenience. The remaining parking spaces are 54 less than allowed by the zoning laws of Ogden, thus constituting the shopping center a non-conforming use.

The effect of the condemnation, as explained by one of the expert witnesses, was to make the three-year-old supermarket a misplaced improvement, for no one would intentionally design and construct such a building on a parcel with such limited parking. The knowledgeable buyer would not purchase the remaining property for a primary supermarket location.

The expert witnesses of both parties were in essential agreement as to the value of the land condemned; there was further agreement that the defendant had suffered substantial damage to its remaining property. Defendant's expert testified there was $470,070.00 in severance damages. Plaintiff's expert assessed such damages to be $226,251.00. The point of contention between the parties was whether the severance damage could be mitigated by the acquisition and improvement of replacement property.

The State urged a tract of land owned by the Weber County School Board could replace the land expropriated. This land was contiguous to the northeast corner of defendant's property. It had an approximate width of 151.75 feet and it fit into the right-angled jog of defendant's property in that area, where the loading dock and waste disposal areas are located.

· The replacement tract was accessible from a side street, Adams Avenue. Defendant had had an option on this land, which it had permitted to expire prior to the service of summons in this action for the reason that experts had advised it the school land was not the equivalent of the condemned property, and would not ameliorate the problems caused by the State acquisition.

Defense counsel objected to any testimony regarding the replacement land until an adequate foundation had been laid establishing its equivalency to the land condemned, and that it was for sale on the market at a specific price on June 7, 1976. The objection was overruled and extensive testimony was presented by plaintiff's witness, Bergeson.

On appeal, defendant contends the trial court committed prejudicial error in submitting to the jury the issue of the replacement land, in mitigation of severance damages.

Under § 78-34-10, a condemnee is entitled to the value of the property condemned, including all the improvements thereon [subsection (1)]; and further if only a part of the larger parcel is condemned, the damages which will accrue to the portion not condemned by reason of its severance from the portion condemned. Subdivision (5) requires each source of damages be separately assessed.

There has been an element of confusion interjected into the case law in this jurisdiction concerning the availability of replacement land and the right to severance damages. In *Provo River Water Users Associated v. Carlson*,[1] this Court ruled there was no adequate foundation of fact to support the condemnee's claim for severance damages. The condemned property was a parcel of 18.75 acres of pasture land situated approximately 1½ miles from the condemnee's farm. The condemnee claimed the loss of the tract depreciated the value of his remaining property as a dairy farm. This Court explained that the facts of the case did not warrant a decision on any theory of severance damages for the following reasons: First, there was no evidence the tract taken was the only pasture land available within a mile and a half of the condemnee's remaining property. Secondly, the condemnee would still not be entitled to severance damages if there were, in fact, other farm land available for purchase which would produce relatively the same results. This Court observed the matters relating to the question of availability of other lands also related to the market value of the land condemned. It said the purchase price of land which produced the same results, as obtained by the condemnee from the pasture tract prior to condemnation, would be the controlling factor in the determination of market value of the property condemned. The Court stated:

1.  103 Utah 93, 133 P.2d 777 (1943).

. . . If he could purchase other pasture land or farm land convertible into pasture, within a distance from his barns comparable to that of the condemned tract, and such other land would provide relatively the same kind of forage for the same number of cows or forage of equal ration-value throughout the seven months he used the wild pasture tract, it could not be contended that his properties in Charleston could be impaired or depreciated by taking the pasture. If another tract of equal forage-producing value and conveniences could be substituted for the tract condemned, whether larger or smaller in area, the defendant would be in relatively the same position he was in before the construction of the reservoir. [Citation.] [2]

This Court held the facts in *Carlson* indicated there was no premise for the application of any rules for severance damage. The verdict and judgment of the trial court were set aside. A new trial was granted to make a determination of the market value of the 18.75 acres condemned, in accordance with the opinion.

The error in *Carlson* was repeated in *State v. Cooperative Security Corporation of Church of Jesus Christ of Latter Day Saints*,[3] wherein this Court stated:

. . . Where severance damage is sought to a remaining tract on the theory that the taking has depreciated the fair market value of that tract there must be proof that no comparable land is available in the area of the condemned land. . .

. . . If similar land to that was available on the date the summons was served, which could have been substituted for the condemned, it cannot be contended that the entire project was depreciated in value because it was economically unfeasible because of lack of pasture land to graze a minimum number of dairy cattle. Under such a state of the record the opinion of experts as to the amounts the project was damaged was wholly immaterial and irrelevant.

The court held that since the evidence indicated the condemned property could have been replaced, there was no basis for the award of severance damage. Thus the case was remanded to reassess the damage for the taking on the basis of the replacement cost.

The principle was again reiterated in *State v. Cooperative Security Corp.*:[4]

. . . where there is other comparable land available to the condemnee that would accomplish the same use to which the land taken had been put—severance damages are not available to one refusing to accept such land; and that in assessing damages in such a case, the value of the land so refused would be the value of the land taken—. . .

Thus, these three cases, rather than adhering to the statutory standard of § 78–34–10, which grants the condemnee compensation for *both* the land taken and severance damage to the remainder, (if there is such), limit recovery to the cost of replacement land, which is deemed the fair market value of the land actually condemned. It is only where there is no replacement land available which will restore the condemnee to the same relative condition prior to condemnation that he is accorded severance damages under these cases. The subsequent cases do not clearly rectify the prior error. In *State v. Howes*,[5] this Court held it is the condemnee's burden to prove severance damage, but before doing so he does not generally have the burden of first showing such damage, if any, could not be minimized or mitigated. In *Howes*, this Court rejected the concept that the condemnee, as a condition precedent to the recovery of severance damages, must prove there was no replacement land available. However, there remained unchanged the

---

**2.** At pp. 102–103 of 103 Utah, at p. 781 of 133 P.2d.

**3.** 122 Utah 134, 138–139, 247 P.2d 269, 271 (1952).

**4.** 1 Utah 2d 178, 180, 264 P.2d 281 (1953).

**5.** 20 Utah 2d 246–247, 436 P.2d 803 (1968).

principle that if replacement land were available, the condemnee was not entitled to severance damages.

In *State v. Style-Crete, Inc.*,[6] this Court again reiterated the *Carlson,* principle:

. . . where the purchaser of other land would place the landowner in relatively the same position as he was before the taking, then the measure of damage suffered by him would be equal to the purchase price of the other land. . .

The *Style-Crete* case sustained the ruling of the trial court, which denied the State's proffered evidence there was replacement land available. The evidence indicated the asserted replacement land would not place the condemnee in the same relative position as prior to the taking, viz., the land would not be an effective substitute for the land taken.

In *State v. Williams,*[7] the State urged the condemnees had failed to meet the burden of proof required to entitle them to severance damages. The State's argument was rejected, because the evidence indicated the suggested replacement land would not cure the damage and place the owner in substantially the same position prior to the taking.

In the matter at hand, the trial court did not adhere to the foregoing case law by denying severance damages on the theory replacement land was available. Instead it devised its own formula, which it characterized as the "cost of cure." In a memorandum decision, the trial court stated the testimony of the expert witness, Bergeson, concerning the replacement land raised a legal issue for which the court could find no authority.

The court observed the lowest estimate of severance damages was approximately a quarter-million dollars. Mr. Bergeson gave an opinion that property owned by the school district was available; he believed the property could be purchased for approximately $51,000. He estimated costs of approximately $40,000 to prepare the replacement land as a parking lot and to modify the physical appearance of the market, including changing the location of the loading ramp. The trial court stated that under the theory advanced by Mr. Bergeson, the landowners could avoid approximately a quarter-million dollar loss in value by spending approximately $90,000. The trial court expressed the belief that an issue was presented for the jury, and the jury could have accepted the theory advanced by Bergeson and granted damages in accordance therewith. The trial court rejected the opinion of Bergeson that defendant's total damage was $88,850, because Bergeson eliminated the value of the land taken ($38,000). The trial court stated:

. . . If you allow the substitution suggested by Mr. Bergeson, you in effect are forcing the landowners in this case to utilize the monies received for the lands and improvements taken to purchase other substituted property whether they desire to do so or not, or suffer a quarter-million dollars in damages. . . .

The Court believes that the law should be, and it therefore rules accordingly, that the landowners should be entitled to keep the price they receive for the lands taken independent of the cost of cure. Inasmuch as there is a way that severance damages can be avoided by expending other monies, they must expend the other monies but are not required to expend the monies received for the thing taken . . .

The trial court then assessed the cost of cure as $88,850, and increased the jury verdict for severance damages from $61,935.65 to this amount. Is the theory adopted by the trial court sustained by the law?

In 4A Nichols on Eminent Domain (3rd Ed.), § 14.22 states:

When the damage to the owner's remaining property can be avoided by grading or repairs, and the reasonable cost of such work is less than the decrease in the market value of the real estate, such cost forms the measure of damages. . . .

---

6.  20 Utah 2d 365, 367, 438 P.2d 537 (1968).

7.  22 Utah 2d 301, 304, 452 P.2d 548 (1969).

Also restoration must be possible without going outside the remaining portion of the tract. The owner's right to compensation cannot be made to depend upon the question of whether adjacent land could be easily bought. Moreover, at least one court has held that the fact that, after the vesting of title in a partial-taking case, the owner (whose remainder area is rendered unusable for its established use) acquires an adjoining tract to restore usability, this does not inure to the benefit of the condemnor so as to reduce the consequential damages to the original remainder area.

The principle set forth in § 14.22 of Nichols is illustrated in *St. Patrick's Church, Whitney Point v. State of New York*,[8] wherein it is stated:

> We are not here dealing with any mitigation of damages by something that occurred or could occur upon the property remaining after the appropriation as in *Mayes Co. v. State of New York*, 18 N.Y.2d 549, 277 N.Y.S.2d 393, 223 N.E.2d 881, where the "cost to cure" theory was allowed because the cure was to occur *within* the bounds of the claimant's lands. Sound reason requires that the theory cannot be used in cases of subsequent acquisitions of lands outside the bounds of the appropriated property; nor should a condemnee's right to compensation be made to depend upon whether adjacent land could be easily be purchased. . . .[9]

The philosophy to support the foregoing principle is expressed in *Department of Highways v. Intermountain Terminal Company*:[10]

P.I.E. was not required by law to expend a large sum of money to avoid the consequences of the predicament in which the Department of Highways placed it through expropriation proceedings. The business acumen of P.I.E. in the discovery of the opportunity to buy other property and the expenditure by it of $260,000 for acquiring such property with a subsequent sale of a part of it should not inure to the benefit of the Department. of Highways. . . .

The State urges the ruling of the trial court can be sustained as a logical extension of the replacement land doctrine of the *Carlson* case, viz., a hybrid theory can be created under which severance damage is not denied but is mitigated by the availability of replacement land. The doctrine of *Carlson* should be, and is hereby, overruled on the ground it violates § 78–34–10(1) and (2). Under *Carlson*, the value of the property condemned is the cost of substitute land which would place the condemnee in the same position he had prior to condemnation. The measure of damages for land condemned is market value. The accepted formula for determining fair market value is what would a purchaser willing to buy, but not required to do so, pay; and what would a seller willing to sell, but not required to do, ask.[11] Another aspect of the *Carlson* doctrine which merits consideration is the onerous burden placed on the condemnee. His compensation is limited to the land available, and its cost, on the day summons is served. The condemnee is coerced into locating the funds and purchasing the land on the day he is served, or he is deprived of just compensation for the damages he has sustained.

8. 30 A.D.2d 473, 294 N.Y.S.2d 275, 277 (1968).

9. See *Gluckman v. State*, 37 A.D.2d 870, 325 N.Y.S.2d 99 (1971); *Campbell v. State*, 39 A.D.2d 615, 331 N.Y.S.2d 75 (1972); 4A Nichols Eminent Domain (3rd Ed.), § 14.2472, pp. 14.337–338: ". . . It has recently been held that whether premises of a like description to those taken are readily available (or whether it was owner's intention to seek similar property) was not relevant to the question of the fair market value of the condemned premises."

10. 164 Colo. 354, 435 P.2d 391, 393 (1968).

11. *State v. Noble*, 6 Utah 2d 40, 44, 305 P.2d 495 (1957). The usual evidentiary basis utilized by experts in rendering an opinion as to market value is cost, income or capitalization, and market or comparable sales. The first two approaches were utilized herein by the experts in their value testimony. The paucity of comparable sales rendered that approach of no value.

The *Carlson* doctrine further distorts the definition of severance damages as defined in § 78–34–10(2). For example, ". . . the damages which will accrue to the portion not sought to be condemned by reason of its severance from the portion sought to be condemned . . ." If the remainder of the condemnee's land is damaged by reason of the severance of part of his land by condemnation, he is entitled to severance damage under the statute. It is a violation of the expressed legislative intent when the remainder is, in fact, damaged to deny severance damage by compelling the condemnee to procure substitute property with his own funds, which allegedly will be reimbursed by means of the compensation paid for the land condemned. The proper measure of severance damages to the remainder is the difference between the fair cash market value before and after the taking.[12]

The State's theory of mitigation of severance damage by replacement land is untenable. Such a doctrine has been rejected by the authorities as cited ante. Furthermore, this doctrine is tantamount to compelling the condemnee to take substitute land in lieu of money for the damages sustained.

. . . This Court has held that just compensation for property taken for public use means compensation in money; that it would make no difference how valuable the property that was contemplated as a substitute is, it could not be substituted in lieu of money, against the wishes of the condemnee. [Citation.][13]

There is no meaningful distinction between the state, in this case, purchasing the school land and compelling defendant to accept it as compensation and confining defendant's damages to the value of the school land. The essential unfairness of the replacement land theory is further illustrated by the facts in this case. The alleged comparative property was situated behind and to the side of the prime parking area. Defendant has characterized it as replacing your front yard with your back yard. A customer to gain access to the store would, in addition to walking from the adjoining property to the shopping center, have to proceed along the side of the supermarket to the entrance. The replacement land cannot be equated with the prime parking area; it does provide a quantitative, but not qualitative replacement of parking spaces.

The replacement property had a different zoning; and Witness Bergeson did not know if defendant could use it for parking under its zoning classification. The plan of the witness was to change the location of defendant's loading docks from their present parallel position at the side of the building to a perpendicular location at the side of the building. His plan was to have the delivery vehicles use the access from Adams Avenue onto the school property to reach the loading dock. Adams Avenue is a small back street, and the witness did not know whether a trailer truck could back from Adams Avenue onto the school property.

The defendant further contends the trial court committed prejudicial error when it refused to order the disclosure of the appraisal report of Witness Bergeson during cross-examination. We agree.

Witness Bergeson had testified as to market value, severance damages, and the replacement land. He further testified he had submitted a written appraisal report to the State. Defense counsel requested a copy of the report, and the witness responded that he did not have it. Defense counsel requested an order requiring its production. The court inquired, "Do you have it with you here?" Mr. Ward replied, "No, I don't, Your Honor." At a conference at the bench, there was a clear implication the report was not available in Ogden, but was in Salt Lake City; thus requiring substantial time and delay to procure it. The State further resisted the motion to produce on the ground it was protected by the "attorney-client" privilege and the "work-product" doctrine. Thereupon, the order for

12. *State v. Peterson*, 12 Utah 2d 317, 321, 366 P.2d 76 (1961).

13. *Shurtleff v. Salt Lake City*, 96 Utah 21, 28, 82 P.2d 561 (1938).

production was denied. Defense counsel was compelled to conduct his cross-examination without an opportunity to compare the witness' testimony with his written report.

As part of defendant's motion for a new trial, defense counsel submitted a Rule 11 Certificate of Counsel in which it was stated that on the morning shortly before the commencement of cross-examination, a copy of the Bergeson written appraisal report was observed at counsel table. The trial court inquired at the post-trial hearing as to the whereabouts of the report at the time defense counsel requested the order for production. State Counsel, Mr. Ward, admitted the report had been in the courtroom that morning shortly before cross-examination was to commence; the report was purposely removed to counsel's vehicle during the morning recess, in anticipation that a request for production might be made.

The trial court requested production of the appraisal report. In a subsequent memorandum decision, the court found only a portion of the report discoverable; the remainder he found not discoverable on the ground it constituted advice given by an expert, retained by counsel, to assist the Attorney General's office on how to proceed with their unique problem. The trial court further found the answers given by State counsel on the request for production "somewhat misleading."

▆▆▆ The actions of State counsel cannot be condoned. He represents the people of this State in a position of trust with a duty to prevent the improper depletion of the State treasury. On the other hand, with the substantial resources of the State at his command, it is not within the ambit of his duty to engage in deceitful or oppressive tactics to deprive a condemnee of his constitutional right of just compensation, Article I, §§ 22, Constitution of Utah.

▆▆▆ The trial court committed prejudicial error when it denied the order for production of the appraisal report for use in defendant's cross-examination of Witness Bergeson. First, the limitations applicable to pretrial discovery are not necessarily applicable to a motion to produce at the trial during cross-examination. Secondly, the appraisal report of the condemnor in an eminent domain proceedings is discoverable.

▆▆▆ Plaintiff urges the report was not subject to production at the trial for the reason it was protected by the work-product doctrine. That claim has no merit. However, if it did, such doctrine is a qualified privilege, and may be waived. The immunity of an attorney's work-product, in respect to a witness' written statement, is waived when that person is placed on the stand as a witness. The person, by becoming a witness, subjects himself to the risks of impeachment. The purpose of this rule is to prevent a party from presenting to a jury a truncated view of the evidence favorable to his position by means of the testimony of the witness; and thereafter refusing to disclose the contemporaneous report which might offer further critical insights.[14]

The appraisal report was not protected by the attorney-client privilege. When an independent agent is retained for the purpose of making a report, whether the report can be deemed a communication from the client to the attorney depends on the circumstances.

▆▆▆ The attorney-client privilege protects a report where the expert is required to examine the client, his personal affairs, or his property, or his mental impressions, in order to evaluate and transmit the same in a manner in which the client is unable, by reason of insufficient scientific or technical training. On the other hand, the privilege does not protect either facts obtained or the mental opinions and calculations of an expert, such as a real estate appraiser, who does not pass on to the attorney information which emanated from the client.

14. *Shaw v. Wuttke*, 28 Wis.2d 448, 137 N.W.2d 649 (1965); *Pacific Northwest Bell Telephone Company v. Century Home Components, Inc.*, 261 Or. 333, 491 P.2d 1023 (1971); *United States v. Nobles*, 422 U.S. 225, 236–241, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975).

■ It is the source of the information rather than the intent to make the communication confidential which determines whether it is privileged. A real estate appraiser who obtains his information by viewing the adversary's property by recourse to public records of permitted land use, and from comparable sales, is not transmitting a client's confidence.[15] The condemnor's appraisal report is subject to pretrial discovery, and does not lie within the aegis of the attorney's work-product immunity. This is so because of the unique nature of a condemnation action.[16]

. . . A condemnation case is unique in that the pleadings do not contain the parties' contentions as to compensation, hence there is no basis for discovery relating to pleading and in many respects the defendant is in the position of a plaintiff, since he has the burden of proof as to compensation. . . .

Discovery of a report prepared by an expert engaged by an adverse party has been denied on the basis of unfairness to the party who engaged the expert.[17] This policy is reflected in Rule 26(b)(4)(A) U.R.C.P., where a party is allowed to discover the facts known and opinions held by an expert only upon a showing of exceptional circumstances or upon a showing that manifest injustice would result unless discovery is permitted.

■ However, this Court has acknowledged the special circumstances involved in a condemnation case, viz., the State is suing a private individual and undoubtedly has caused an appraisal of the property to be made. Under such circumstances, it is both practical and just that discovery be liberally permitted.[18]

Further illustration is found in *Shell v. State Road Department*;[19] the court ruled the appraisal reports of the State in a condemnation proceeding were subject to pretrial discovery. The court stated:

Nevertheless, conceding that in private litigation the reports and opinions of experts should be considered a "work product" exempt from compulsory discovery, we are convinced that the "work product" immunity should not extend to the type of information sought in this eminent domain proceeding. We realize that the rule pronounced herein with reference to condemnation proceedings is diametrically opposite to the prevailing rule in ordinary litigation. However we are convinced that there is no inconsistency because both rules are based upon sound public policy when the sphere in which each operates is properly analyzed.

The court cited the exhortation in its Rules of Civil Procedure, which is similar to Rule 1(a), U.R.C.P. that the rules "shall be [liberally] construed to secure the just, speedy, and inexpensive determination of every action." The court admonished that in a condemnation proceeding the property of the land owner is subject to taking by the condemnor without the owner's consent. The condemnee is a party neither through fault nor volition of his own. The court cited Florida's constitutional provision providing for just compensation to an owner for the taking. [Just compensation is required in Art. I, § 22, Constitution of Utah.] The court observed that in view of this constitutional provision, the awarding of just compensation should be the care of the condemning authority as well as that of the condemnee. The court further observed:

Unlike litigation between private parties condemnation by any governmental authority should not be a matter of "dog eat dog" or "win at any cost." Such attitude and procedure would be decided-

---

**15.** *Oceanside Union School District v. Superior Court*, 58 Cal.2d 180, 23 Cal.Rptr. 375, 373 P.2d 439 (1962); *San Diego Professional Association v. Superior Court*, 58 Cal.2d 194, 23 Cal.Rptr. 284, 373 P.2d 448 (1962); *State v. Steinkraus*, 76 N.M. 617, 417 P.2d 431 (1966).

**16.** 7 Moore's Federal Practice, Part 2 (2d Ed.), § 71 A. 20[3], p. 71 A. 305.

**17.** 4 Moore's Federal Practice (2d Ed.), § 26.-66[1], p. 26–463.

**18.** *State Road Commission v. Petty*, 17 Utah 2d 382, 412 P.2d 914 (1966).

**19.** Fla., 135 So.2d 857, 860–861.(1962).

ly unfair to the property owner. He would be at a disadvantage in every instance for the reason that the government has unlimited resources created by its inexhaustible power of taxation. Moreover it should be remembered that the condemnee is himself a taxpayer and as such contributes to the government's "unlimited resources."

Considering the nature of the condemnation proceedings, we hold that there is no violation of the essential requirements of law in compelling the State Road Department to produce in advance of trial information bearing on the issue of "just" compensation.

\* \* \* \* \* \*

We do not believe this procedure will place the State Road Department at a disadvantage in trying its case. We can envisage no "unfairness" to this governmental agency. If the governmental unit or agency is seeking to effectuate the "summum bonum," as it should in ever condemnation suit, there is no justification for cutting corners or being secretive to the possible detriment of the individual land owner whose property is being taken from him against his will.

It may be that the condemnor will derive an advantage by disclosing these pertinent matters prior to trial. It might develop that the condemnee, after learning the basis for the evaluation of his property, will decide to settle the issues without going to trial, thereby resulting in a "speedy and inexpensive determination" of the case.

The other points of appellant are primarily resolved by the discussion of the law in this opinion. Plaintiff's cross-appeal asking the original jury verdict be reinstated is without merit.

In conclusion, I think it proper to respond to Justice Stewart's statement, "[t]he contention that these cases should be overruled was not presented to the trial court and was not in any way argued by the parties before this Court." In my view, these cases were squarely placed before the court by the State. It devoted pages 10 through 20 of its brief arguing for the reaffirmance of those cases which I view as not being in consonance with the condemnation clause of our Constitution.

WILKINS, J., concurs.

HALL, Justice (concurring in result).

I concur in remanding this case for.a new trial. However, I deem it neither appropriate nor necessary to overrule existing Utah law on severance damage in order to do so. In regard to such damage, I share the views of Justice Crockett and Justice Stewart as expressed in their dissenting opinions.

STEWART, Justice (concurring and dissenting).

I concur in the conclusion that this case should be returned to the trial court for a redetermination of damages, but I do so on the ground that the present law was not properly applied by the trial court. The appellant, in my view, correctly contends that the trial court failed to comply with the law stated in *State Road Comm. v. Williams and Prestwich*, 22 Utah 2d 301, 452 P.2d 548 (1969); *State Road Comm. v. Style-Crete, Inc.*, 20 Utah 2d 365, 438 P.2d 537 (1968). These cases hold that the cost of cure measure of severance damages is applicable only when the replacement property would totally cure the damage caused by the condemnation to that portion of land not condemned. The evidence in this case falls woefully short of showing that the condemnees were as well off with replacement land as with the land subject to the actual taking. Accordingly, the case should be remanded for a redetermination of damages, and that determination should be made without reliance upon "cost of cure."

However, I cannot concur with that portion of Justice Maughan's decision which would overrule the rule of law in *Prestwich*, supra, and *Style-Crete*, supra, and the other cases mentioned in his opinion. The contention that these cases should be overruled was not presented to the trial court and was not in any way argued by the parties before this Court. The appellant simply contended

that existing law was improperly applied. The interpretation of the condemnation clause of the Constitution in Justice Maughan's scholarly opinion may be the better view; but I am not prepared to decide that issue until it has been presented to this Court in a proper adversary proceeding in which the State and a condemnee have had an opportunity to present whatever arguments they choose to present in support and against the existing line of cases. The issue has not been joined and the Court afforded the benefit of argument on the issue in this case. A cursory review by the State's brief of the existing line of cases does not address the underlying validity *vel non* of that law.

I concur in all other aspects of Justice Maughan's opinion.

CROCKETT, Chief Justice (dissenting).

I am unable to agree with what seems to be a major premise of the main opinion that severance damages must be awarded without regard to availability of land which would replace the land taken. A condemnee should not be awarded damages as if the taking rendered his remaining land unfit for its established use if the means of cure, or of minimizing damages, is available by exercising reasonable prudence; and this is true even if it involves making expenditures for substitute facilities, whether within his own land or outside its boundaries.[1]

It is appreciated that the power of eminent domain is an awesome one, which should be exercised with restraint, and that a property owner affected thereby should be afforded just and adequate compensation. On the other hand, that power is exercised by the sovereign (the public) only when and only to the extent necessary to discharge its responsibilities to the public. It is to that same sovereign that the condemnee looks for the public services he enjoys, including public streets and highways so that the public has access to his property (or business), and also for the protection of his person and property. As a member of the public enjoying those benefits and protections, he is also obliged to be governed by reasonable restraints and to exercise care and prudence in mitigating the damages which it is necessary for the sovereign to incur in discharging its responsibilities to him and to the public.[2] The efforts required of a condemnee to lessen his damages may include a reasonable expenditure, which he may recover as a part of his damages.[3]

Consistent with the principles just stated, I see no good reason why this duty should be limited to expenditures on the condemnee's remaining land. The limitation should be what in fact constitutes reasonable and prudent action, taking into consideration all of the pertinent factors, including knowledge, opportunity, and the relative amount of expense that would be involved.[4] It is also fair to state that a condemnee would not be required to make excessive expenditures in comparison to the potential injury threatened, and a lack of sufficient available funds might excuse him from making such a replacement.[5]

With appropriate deference to the main opinion, I am unable to agree with the frontal attack upon and the overruling of the prior Utah cases [6] it refers to which deal with the subject of mitigating and limiting severance damages. It is my judgment

1. See the Utah cases referred to in the main opinion; and Nichols on Eminent Domain, § 12.2[3].

2. This same duty is imposed in tort and contract cases even though there is no public purpose justification for the conduct of the person who causes injury. 22 Am.Jur.2d 54, Damages §§ 33 et seq. Annotation at 48 A.L.R.2d 356, § 3.

3. *Albers v. County of Los Angeles*, 62 Cal.2d 250, 42 Cal.Rptr. 89, 398 P.2d 129.

4. *Beagley v. U. S. Gypsum Co.*, 120 Utah 487, 235 P.2d 783.

5. 22 Am.Jur.2d 54, Damages, § 33.

6. *Provo River Water Users' Assn. v. Carlson*, 103 Utah 93, 133 P.2d 777 (1943); *State v. Cooperative Security Corp.*, 122 Utah 134, 247 P.2d 269 (1952); *State v. Style-Crete, Inc.*, 20 Utah 2d 365, 438 P.2d 537 (1968).

that those cases were well considered and represent proper applications of the rule of mitigation of damages as applied to their particular circumstances. The rule which the majority opinion appears to espouse impresses me as unnecessarily rigid and may have the effect in some instances of awarding excessive damages by requiring the courts to treat as irreparable, injuries which could be minimized. Moreover, I cannot agree with the proposition that the main opinion's proposed rule is the prevailing view in the country.

The authorities on which the majority opinion primarily relies are: (1) Nichols on Eminent Domain (3rd Ed.) § 14.22; and (2) cases which cite that same Nichols section as authority for their position. The cases which Nichols cites are not, in my view, inconsistent with the proposition that the question whether adjacent land could be easily bought is a factor to be considered in determining damages. Nichols first cites *State Highway Dept. v. Thomas*, 115 Ga. App. 372, 154 S.E.2d 812. In that case, the State condemned land under lease for use as a golf course and argued that the golf course proprietor had a duty to minimize its damages by relocating greens and fairways on other lands of his lessor. The appellate court merely affirmed a trial court's ruling that a witness for the condemnor could not testify that "in his opinion it was possible for the lessee-condemnee to minimize damages by relocating." The relevant quote from the case is:

> . . . the mere fact that it might have been possible to relocate the lessee-condemnee's facilities on other portions of Mrs. Thomas' land was wholly insufficient to prove that the condemnee Golfland, Inc. could in fact have minimized its damages by any such course of conduct. It does not appear that the condemnor offered to prove these essentials so as to make this evidence admissible, and under these circumstances, this enumeration of error is not meritorious . . .

Nichols next cites *State v. Herman*, 405 S.W.2d 904 (Mo.1966). In that case, the State's proffered evidence was that the landlock which resulted from the taking could have been cured by the condemnee's acquiring sufficient land to build an access road and that the necessary land was available to the condemnee. The condemnee's counter-evidence was that the cost of such a road would be about $27,000.00, an excessive expenditure where the State insisted the total severance damage was only $2,200.00. In affirming the trial court's exclusion of the evidence proffered by the State for the reasons argued by the condemnee, the appellate court further observed that no offer to sell the access road acreage was ever communicated to the condemnee in the time period of the taking. The condemnee had no real opportunity to evaluate the access road purchase as a means of mitigation.

Finally Nichols cites a Utah case, *Southern Pacific Company v. Arthur*, 10 Utah 2d 306, 352 P.2d 693. In that case, the condemnor took, for a sand and gravel source, land on Promontory Point which had been used by the condemnee as sheep range. The condemnor's gravel pits were so steep and extensive that sheep could not safely cross them to reach any available replacement land from the remaining land. The holding was that available land located on the other side of the gravel pits, so that it could not be economically unified with the remaining lands of the condemnee, could not properly be regarded as replacement lands at all.

The doctrine of *Shurtleff v. Salt Lake City*,[7] cited in the majority opinion, is not inconsistent with the concept that a condemnee has a duty to act with reasonable prudence to avoid injurious consequences from the taking. He cannot constitutionally be forced to accept replacement land in lieu of money, but his recovery for severance damages can constitutionally be limited to the amount which would adequately have compensated him had he acted with reasonable prudence.

7. 96 Utah 21, 82 P.2d 561 (1938).

It is my opinion that if the instructions in this case are looked at in their entirety, as they are entitled to be, they do not misstate sound and established law as to severance damages; and I am not persuaded to join in reversing our cases which have long stood as the law in regard to mitigating damages. I would therefore affirm the judgment.

