#25769-rev & rem-SLZ

**2011 S.D. 70**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

PATRICK R. HALL, MARLYN G.
ERICKSON and FUEL FOOD MART, INC.,
A SOUTH DAKOTA CORPORATION,              Plaintiffs and Appellants,
          v.
STATE OF SOUTH DAKOTA, by and
through the SOUTH DAKOTA
DEPARTMENT OF TRANSPORTATION
and the SOUTH DAKOTA DEPARTMENT
OF TRANSPORTATION COMMISSION,            Defendants and Appellees.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE  SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE JOHN J. DELANEY
Judge

* * * *

BRIAN W. BLAESSER of
Robinson & Cole, LLP
Boston, Massachusetts
and
JEFFREY G. HURD of
Bangs, McCullen, Butler, Foye
  & Simmons, LLP
Rapid City, South Dakota                 Attorneys for plaintiffs
                                         and appellants.


KARLA L. ENGLE of
South Dakota Department
  of Transportation
Pierre, South Dakota                     Attorney for defendants
                                         and appellees.

* * * *

                                         ARGUED ON MAY 24, 2011
                                         OPINION FILED **10/26/11**

ZINTER, Justice

[¶1.]          Patrick Hall, Marlyn Erickson, and Fuel Food Mart, Inc. ("Landowners") own property abutting former Exit 66 on Interstate 90 (I-90), a controlled-access highway that passes by Ellsworth Air Force Base.  A part of Landowners' property was taken by condemnation in 1961 for the construction of I-90 and Exit 66.  In that condemnation proceeding, the State mitigated the severance damages for the property not taken because of the "special benefit" the remaining property would receive from access that was designated to be provided at Exit 66.  However, in 2003, the State removed the Exit 66 interchange to enhance the viability of the Air Force Base.  Landowners subsequently filed this suit for inverse condemnation based on the closure of Exit 66.  The circuit court granted summary judgment for the State, concluding that Landowners never possessed any property right that could have been taken.  We reverse and remand for a trial on damages.

*Facts and Procedural History*

[¶2.]          Landowners own two parcels of land (the "Property") that abut North Ellsworth Road (a north-south conventional highway), I-90 (an east-west controlled-access highway), and the former location of Exit 66 (the former interchange on I-90 for North Ellsworth Road).  From 1962 until October 1, 2003, the Property enjoyed indirect access to and from I-90 via Exit 66.

[¶3.]          Landowners operated a Flying J Truck Stop on the Property.  The truck stop business was uniquely dependent upon the access provided at Exit 66.  The sale of gasoline, diesel fuel, and convenience store items specifically catered to

travelers on I-90. On October 1, 2003, the State closed Exit 66 and removed all access to I-90 at that location. As a result of the State's removal of Exit 66, the Flying J suffered an immediate loss of business and was forced to cease operations on October 23, 2003.

[¶4.] In 1961, the State obtained the right-of-way for I-90 and the northeast and northwest quadrants of the Exit 66 interchange by condemnation. At that time, there was no east-west highway where I-90 was to be constructed. The South Dakota Department of Transportation's I-90 construction plans were referenced in the option agreement by which the State obtained its right-of-way in the condemnation proceedings. The plans indicated that the Property would have indirect access to I-90 through the interchange that became Exit 66. Therefore, in calculating the just compensation due for acquisition of its easement on the Property, the State's appraisal noted that "the presence of the interchange" would be a "significant" and "special benefit" to the Property. The appraisal concluded that "the increase in [the remaining Property's] land values next to the interchange would more than offset the severance damages on the [Property not taken]." Consequently, the State offset severance damages for the Property remaining after the condemnation. Of the forty properties taken in this five-mile section of the interstate project, Landowners' Property was the only property that the State determined to be specially benefitted.

[¶5.] There is no dispute that the State's 2003 closure of Exit 66 was unrelated to road design, traffic safety, or interstate travel. The Exit was closed to eliminate land uses at Exit 66 that were deemed "incompatible" with the continued

viability of Ellsworth Air Force Base.[1]  To remove the threat that incompatible uses posed to the continued operation of Ellsworth, the State closed Exit 66 and replaced it with a new exit approximately one mile to the east.[2]

[¶6.]        On August 1, 2001, prior to the closure of Exit 66, Landowners filed a complaint seeking monetary damages and a declaratory judgment.  Landowners contended that the closure would constitute an inverse condemnation of the Property.  The circuit court granted summary judgment for the State.  We reversed

---

1.    One of the criteria used to evaluate air force base closures is the presence of incompatible uses.  The Flying J was considered an incompatible use because it was within Ellsworth's Accident Protection Zone (APZ), an area close to the takeoff and landing threshold of the main runway.

2.    In 1995, representatives from Ellsworth, Box Elder, Rapid City, Pennington County, and Meade County commissioned a Joint Land Use Study (JLUS) to "guide the political bodies of the communities surrounding Ellsworth Air Force Base towards mitigating the incompatible land uses."  To best achieve the desired result of relocating incompatible land uses, the JLUS recommended that Exit 66 be closed and a new interchange be constructed one mile to the east.

      A year after the JLUS report, the South Dakota Department of Transportation (DOT) and the Rapid City Area Metropolitan Planning Organization hired a firm to complete a Justification Study (JS) to provide remedies for the incompatible land use problem.  The JS concluded that Exit 66 was a lynchpin to existing commercial development, noting that "[b]ecause of the volume of traffic that uses the Exit 66 interchange, its immediate vicinity (within the APZ 1 and 80 DNL noise contour) has become a natural magnet for commercial development that has occurred over a long period of time."  The JS recommended that closing Exit 66 and constructing a new interchange one mile to the east "relocates incompatible development."

      Dennis Landguth, then deputy secretary of the DOT, testified that the process that initiated the closure of Exit 66 and the construction of the new Exit 67 was the JLUS.  Landguth also testified that the purpose of closing Exit 66 and constructing the new exit was to eliminate those businesses that were incompatible with the APZs around the runway at Ellsworth Air Force Base.

and remanded to consider whether compensable damages were incurred in light of the purpose of the closure, the extent of access denied, and the reasonableness of the closure. *Hall v. State ex rel. S.D. Dep't of Transp.* (*Hall I*), 2006 S.D. 24, 712 N.W.2d 22. At the time we decided *Hall I*, discovery had not disclosed that the State had offset severance damages in the 1961 condemnation because of the special benefit the Property would receive from the State's designated access to I-90 at Exit 66. On remand, Landowners raised a new takings argument based on the special benefit and offset of severance damages disclosed in discovery.

[¶7.]        The circuit court granted summary judgment in favor of the State without addressing the new argument. The circuit court concluded that Landowners suffered no loss of right of access to or from I-90 because, in the court's view, a controlled-access highway statute prevented abutting property owners from ever obtaining any right of egress and ingress to a controlled-access highway. The court relied on *Darnall v. State*, 79 S.D. 59, 67, 108 N.W.2d 201, 205 (1961) (concluding that no just compensation was due for a loss of access to a highway because there was no "unrestricted right of direct access to [a landowner's] business establishment" from a newly created controlled-access highway). The court distinguished *Hurley v. State*, 82 S.D. 156, 143 N.W.2d 722 (1966) (allowing just compensation when a controlled-access highway is created from a conventional highway to which the landowners enjoyed access predating the change). The court concluded that there was no deprivation of a right of access, and therefore no compensable taking or damage could follow.

[¶8.] Landowners raise several issues on appeal. We conclude that the dispositive question is whether Landowners' Property was subject to a second taking or damage as a result of the State's 2003 change in access that had been designated in the 1961 condemnation and used to reduce severance damages to the Property.

*Decision*

[¶9.] This Court reviews a grant of summary judgment "to determine whether the moving party has demonstrated the absence of any genuine issue of material fact and entitlement to judgment on the merits as a matter of law." *DRD Enterprises, LLC v. Flickema*, 2010 S.D. 88, ¶ 10, 791 N.W.2d 180, 183-84. There are no genuine issues of material fact on the issue we address.[3] The "circuit court's conclusions of law are reviewed de novo." *Id.*

[¶10.] Article VI, § 13 of the South Dakota Constitution provides: "Private property shall not be taken for public use, or damaged, without just compensation[.]" This provision requires the State to compensate a property owner not only when private property is taken, but also when it has been damaged, an additional protection not contained in the U.S. Constitution. *Krier v. Dell Rapids*

---

3. At oral argument, Landowners' counsel contended that there were genuine issues of material fact remaining for trial. However, those disputes related primarily to the issues on which we originally remanded. We are deciding this case under the Landowners' new argument. We see no genuine issues of material fact relating to liability under that new argument. Disputes of fact are not material unless they change the outcome of a case under the law. *Jerauld Cnty. v. Huron Reg'l Med. Ctr., Inc.*, 2004 S.D. 89, ¶ 41 n.4, 685 N.W.2d 140, 149 n.4.

*Twp.*, 2006 S.D. 10, ¶ 21, 709 N.W.2d 841, 846. Damage to property is compensable if the injury is peculiar to the land:

> [I]t is a basic rule of this jurisdiction governing compensation for consequential damages that where no part of an owner's land is taken[,] but because of the taking and use of other property so located as to cause damage to an owner's land, such damage is compensable if the consequential injury is peculiar to the owner's land and not of a kind suffered by the public as a whole.

*Id.* ¶ 23. Thus the question is whether the closure of Exit 66 caused compensable damages that were peculiar to the Property and not of a kind suffered by the public as a whole. The compensable damage element of this question requires us to first determine whether Landowners were deprived of any property right.

[¶11.] Generally, a property owner has no right of access to a newly-constructed controlled-access highway where there was no pre-existing highway. 8A Nichols on Eminent Domain § G16.03[2][a][iii] at G16-26 (3d ed. 2007) ("It has been held that where there was no pre-existing road, the owner had no access to begin with, and was therefore not deprived of any rights.")[4] We have followed this rule, concluding that a landowner abutting one conventional highway does not have a right to compensation for not being given *initial* access to a new controlled-access highway where the new controlled-access highway did not interfere with the

---

4.     *See State v. McDonald*, 352 P.2d 343, 350 (Ariz. 1960); *Schnider v. State*, 241 P.2d 1, 2-3 (Cal. 1952); *Dep't of Transp. v. Hardin*, 231 Ga. 359, 361, 201 S.E.2d 441, 443 (1973); *Lehman v. Iowa State Highway Comm'n*, 99 N.W.2d 404, 406 (Iowa 1959); *Riddle v. State Highway Comm'n*, 339 P.2d 301, 309 (Kan. 1959); *D'Arago v. State Roads Comm'n*, 180 A.2d 488, 491 (Md. 1962); *Morris v. Mississippi*, 129 So. 2d 367 (Miss. 1961); *State v. Clevenger*, 291 S.W.2d 57, 62 (Mo. 1956); *Morehead v. State Dep't of Roads*, 236 N.W.2d 623, 626 (N.D. 1975); *State v. Calkins*, 314 P.2d 449 (Wash. 1957); 3 Nichols on Eminent Domain § 10.03[6][d], at 10-132 (3d ed. 1994).

landowners' access to the abutting conventional highway. *See Darnall*, 79 S.D. at 70, 108 N.W.2d at 207. On the other hand, we have recognized a right to compensation for damages occasioned by the loss of access to a conventional highway that was converted to a controlled-access highway, a ruling consistent with most states. *See Hurley*, 82 S.D. at 163-64, 143 N.W.2d at 726.

[¶12.]    Today's case is different than both *Darnall*[5] and *Hurley*.[6] We have not had occasion to consider Landowners' new argument that an abutting property owner is entitled to compensation for damages when the initial compensation for a physical taking is offset because of the special benefit of access the State indicates the remaining property will be afforded, but that access is later removed. We also previously declined to address the State's argument that controlled-access highway statutes like SDCL 31-8-6 prevent a landowner from ever obtaining access rights. We declined to address the State's argument in *Hall I* because the argument had not been presented to the circuit court. 2006 S.D. 24, ¶¶ 11-12, 712 N.W.2d at 26-27. Both arguments are now squarely presented for review.

---

5.    The Darnalls' property was not taken to construct a controlled-access highway, and no access had ever been contemplated to the new controlled-access highway. *Darnall*, 79 S.D. at 69-70, 108 N.W.2d at 206-07. In this case, the State mitigated the severance damages it owed for the abutting Property in the 1961 taking because the State designated that access would be provided to the remaining Property via Exit 66.

6.    In *Hurley*, the state converted an existing conventional highway into a controlled-access highway. 82 S.D. at 159, 143 N.W.2d at 724. In the process, the state erected a barrier impairing the landowners' pre-existing right of access to the highway. The state was required to compensate the landowners because they had a pre-existing right of access to the highway. *Id.* at 164, 143 N.W.2d at 726.

[¶13.] The Legislature has limited the right of access to controlled-access highways. SDCL 31-8-1 provides that an owner of land abutting a controlled-access highway has "no right or easement or only a controlled right or easement of access . . . by reason of the fact that their property abuts upon [a] controlled-access facility[.]"[7] The "controlled right" of access is defined in SDCL 31-8-6: "No person has any right of ingress or egress to, from or across any controlled-access facility to or from any abutting land, except at any designated point at which access may be permitted."[8]

[¶14.] States with statutes similar to SDCL 31-8-6 have concluded that a landowner abutting a new controlled-access highway, where no road had previously been located, does not have the right of access possessed by a landowner abutting a conventional highway. *See Dep't of Transp. v. Hardin*, 231 Ga. 359, 361, 201 S.E.2d

---

7. The full text of SDCL 31-8-1 provides:

> For the purposes of this chapter, a controlled-access facility is defined as a highway or street especially designed for through traffic, and over, from, or to which owners or occupants of abutting land or other persons have no right or easement or only a controlled right or easement of access, light, air, or view by reason of the fact that their property abuts upon such controlled-access facility or for any other reason.

8. The 2001 version of SDCL 31-8-6 that was in effect at the time of the Exit closure provided: "No person shall have any rights of ingress or egress to, from or across controlled-access facilities to or from abutting lands, except at such designated points at which access may be permitted, upon such terms and conditions as may be specified from time to time." The parties do not contend there is any substantive difference between that version and the current version of the statute.

441, 443 (1973) (construing former Ga. Code Ann. § 95-1703a[9] now Ga. Code Ann. § 32-6-113); *State Highway Comm'n v. McDonald's Corp.,* 509 So. 2d 856, 861 (Miss. 1987) (construing Miss. Code Ann. § 65-5-7[10]). A controlled-access highway is designed to facilitate rapid movement and heavy traffic and is "not intended to give adjoining property owners access to the highway except at limited points." *Hardin*, 231 Ga. at 361, 201 S.E.2d at 443. *See also Ray v. State Highway Comm'n*, 196 Kan. 13, 26, 410 P.2d 278, 287 (1966) (Fatzer, J., concurring) ("These [controlled-access] highways were to be free from abutter's access except at designated interchange areas or crossovers, and were designed primarily to serve the traveling public and only secondarily the land over which they pass."). Therefore, the general language in statutes like SDCL 31-8-6 "has the effect of preventing a property right of access from arising for the benefit of contiguous landowners in a newly created limited access highway." *Hardin*, 231 Ga. at 361, 201 S.E.2d at 443.

[¶15.]    An abutting landowner may, however, obtain a right of access to a controlled-access highway when a state's highway authority grants a right of access. "There is no right of access to [a controlled-access highway] thoroughfare, *except that specifically granted by the Highway Department.*" *McDonald's Corp.*, 509 So.

---

9.    Georgia Code § 95-1703a provided: "No person shall have any right of ingress to or egress from or passage across any limited-access highway to or from abutting lands except at the designated points to which access may be permitted[.]"

10.   Mississippi Code § 65-5-7 provided in pertinent part: "No person shall have any right of ingress or egress to, from, or across controlled-access facilities to or from abutting lands except at such designated points at which access may be permitted, upon such terms and conditions as may be specified from time to time."

2d at 861 (emphasis added). *See also* SDCL 31-8-6 (generally prohibiting a right of access "except at any designated point at which access may be permitted"). The question then, is whether the State granted a right of access for this Property. Landowners contend that such a right arose from the 1961 condemnation when the State reduced the just compensation it paid because the State designated that access would be provided this property at Exit 66. The State disagrees.

[¶16.]        Although the State relies heavily on SDCL 31-8-6, that statute does not prevent a property from acquiring a right of access in the course of a condemnation proceeding creating a controlled-access highway. On the contrary, SDCL 31-8-6 provides that the State may designate a point at which access may be permitted. Furthermore, a number of courts have recognized a constitutional right to compensation for the loss of access to a controlled-access highway under facts quite similar to the case we consider today. *See Alsop v. State*, 586 P.2d 1236 (Alaska 1978); *Johnson Bros. Grocery v. State, Dep't of Highways*, 304 Minn. 75, 229 N.W.2d 504 (1975); *Filler v. City of Minot*, 281 N.W.2d 237 (N.D. 1979). Notwithstanding the existence of statutes like SDCL 31-8-1 and 31-8-6,[11] those

---

11.    The Alaska statute provided: "No person has the right of ingress or egress to, from, or across controlled-access facilities to or from abutting land, except at designated points at which access is permitted, upon the terms and conditions specified from time to time." Alaska Stat. § 19.20.030.

       The Minnesota statute provided: "No person shall have any rights of ingress or egress to, from, or across controlled-access highways to or from abutting lands, except at the designated points or roadways thereof where access is permitted by such road authorities upon such terms and conditions as such road authorities specify." Minn. Stat. Ann. § 160.08. In *Hendrickson v. State*, 267 Minn. 436, 439, 127 N.W.2d 165, 169 (1964), the court recognized that Minnesota Statute § 160.08 "prohibit[ed] ingress to and egress from, or travel

(continued . . .)

courts recognized a landowners' constitutional right to compensation for a loss of indirect access to controlled-access highways. The right to compensation arose because, in the course of prior condemnation proceedings, the states indicated that those landowners would have access at designated points, but the states subsequently removed that access. The courts concluded that the designation of access in the prior proceedings created a subsequent right to compensation because the landowners had not been fully compensated at the time of the initial takings. A close examination of those cases is instructive.

[¶17.] In *Filler*, the landowners' predecessor owned property that abutted and had direct access to a conventional highway. 281 N.W.2d at 239. While converting a portion of the highway into a four-lane controlled-access highway in 1961, North Dakota acquired a thirty-foot strip of the predecessor's property abutting the highway. The right-of-way plat filed in the condemnation proceeding indicated the state would provide three access points to the new controlled-access highway through a new frontage road abutting the landowners' property. The landowners used those designated access points until 1976, when the state closed

---

(. . . continued)

across, controlled-access highways except at points designated by appropriate authorities." The court in *Johnson Bros.*, 304 Minn. at 77-78, 229 N.W.2d at 505, relied on *Hendrickson* in making its decision.

The North Dakota statute provided: "No person has any right of ingress or egress to, from or across controlled-access facilities to or from abutting lands, except at such designated points at which access may be permitted, upon such terms and conditions as may be specified from time to time." N.D. Cent. Code § 24-01-31.

them. After 1976, the landowners could only gain access to the controlled-access highway by means of a circuitous route.

[¶18.] Like our case today, North Dakota took the position that when it acquired the property from the landowners to create the controlled-access highway, it also acquired the right under N.D. Cent. Code § 24-01-31, *see supra* note 11, to subsequently eliminate access points along the controlled-access highway. Although the right-of-way plat showed the access points, North Dakota argued that it had not given up its right-of-access control pursuant to the controlled-access highway statutes.

[¶19.] The North Dakota Supreme Court rejected the state's argument because there was no indication that the initial access points designated by the state were not relied upon in mitigating the landowners' damages in the prior condemnation settlement. *Filler*, 281 N.W.2d at 240-41. The court held that because the landowners' ability to access the controlled-access highway was used as a mitigating factor in the original condemnation, the later removal of the designated access points created a new compensable injury to the landowners' property. The court observed that "the State does not necessarily acquire the right to indiscriminately alter or eliminate access at future dates without payment of compensation." *Id.* at 241. "Where . . . access control is subsequently modified to the extent that access is no longer reasonable or is substantially more unreasonable, the abutter has suffered a new injury for which he has never been compensated and is thus entitled to compensation at this later date." *Id.*

[¶20.]     In *Johnson Bros.*, Johnson's predecessor owned property abutting and having direct access to Hudson Road, which was at the time designated as Highway No. 12.  304 Minn. at 76, 229 N.W.2d at 504.  In the 1940s, Highway No. 12 became a controlled-access highway and was shifted to a new permanent location paralleling Hudson Road.  *See Courteaus, Inc. v. State, Dep't of Highways*, 268 N.W.2d 65, 66 (Minn. 1978) (clarifying that the new Highway No. 12 in *Johnson Bros.* was a controlled-access highway).  Hudson Road was included within the right-of-way of Highway No. 12, and the state instituted condemnation proceedings for a partial taking of Johnson's property to accomplish construction on Hudson Road.  After the construction, a driver could access the controlled-access highway from the Johnson property by crossing Hudson Road and entering either the westbound lane or a crossover to the eastbound lane of the controlled-access highway.

[¶21.]     In 1973, the state closed access from Johnson's property across Hudson Road to the controlled-access highway.  Only a circuitous route from Johnson's property to the controlled-access highway remained.  Thereafter, Johnson successfully pursued an action for inverse condemnation.  The Minnesota Supreme Court concluded that a second compensable taking occurred in 1973 when Johnson's access to the controlled-access highway was closed because the state had failed to compensate the landowner in the condemnation for the removal of the access that was available until the state removed it.  *Johnson Bros.*, 304 Minn. at 78, 229 N.W.2d at 505.

[¶22.] In *Alsop*, Alaska condemned part of Alsop's property to construct a controlled-access highway (the New Seward Highway) where no pre-existing highway had been located. 586 P.2d 1236. Alsop's remaining property abutted the New Seward Highway and was in the vicinity of 76th Avenue. Alsop testified that the state's agreement to build an intersection on the New Seward Highway at 76th Avenue was crucial to the settlement of his condemnation claim.

[¶23.] The New Seward Highway was built with an intersection at 76th Avenue providing access to Alsop's property. In reliance on the 76th Avenue intersection, Alsop developed his property. Three years later, the state upgraded the New Seward Highway and in the process closed the 76th Avenue intersection and replaced it with an overpass. Alsop claimed that he incurred compensable damages for a second taking as a result of "a loss of access due to closure of the 76th Avenue intersection." *Id.* The Alaska Supreme Court agreed, recognizing a taking of a right of access from property abutting a controlled-access highway under the following conditions:

> [A landowner] must demonstrate that he or a predecessor in interest had a portion of his property taken for the original construction project, that he or his predecessor relied on construction of an [access point] in settling or receiving an award for [his] condemnation claims, and that his remaining property has decreased in value as a result of the highway modifications.

*Id.* at 1240 (footnote omitted).

[¶24.] Although this issue has not been extensively litigated, these cases demonstrate that an abutting property owner may acquire a compensable right of access to a controlled-access highway when access is designated and used to settle or mitigate damages in a condemnation, but that access is later removed. The

State, however, argues that *Filler* and *Johnson Bros.* are distinguishable because those landowners originally possessed the right of direct access to conventional highways. The State points out the Landowners in this case had no pre-existing right of access to a conventional highway where I-90 was constructed. Therefore, the State argues that because Landowners had no pre-existing right of access to a conventional highway, and because they can generally not acquire rights of access to controlled-access highways, they had no property right of access to I-90 that could have been taken. We disagree with the State's reading of these cases.

[¶25.]     *Filler* and *Johnson Bros.* both involved compensation for loss of indirect access to controlled-access highways and neither of the courts' rationales was predicated upon the right of access to the original conventional highways. The highway in *Filler* had been converted to a controlled-access highway, and in that process, the landowners had been given access to the controlled-access highway. 281 N.W.2d at 239. In *Johnson Bros.*, a new controlled-access highway was created paralleling a conventional highway and the landowner had access to the controlled-access highway through the conventional highway. 304 Minn. at 76-77, 229 N.W.2d at 504-05. In both cases, the courts found a right to compensation not because of a loss of access to the conventional highways. The right to compensation was recognized because there was a second, uncompensated taking occasioned by a change in access to the controlled-access highways that had previously been permitted. Moreover, the State has not attempted to distinguish *Alsop*. In that case there was no pre-existing conventional highway. 586 P.2d at 1237. Nevertheless, a second taking was recognized because the state had designated

access to the new controlled-access highway, the landowner had relied on that access in developing his property, and Alaska subsequently removed the designated access.

[¶26.]     This type of second taking is recognized in another analogous situation described as the "change of plans doctrine." *See Olson v. State*, 12 Ariz. App. 105, 107-08, 467 P.2d 945, 947-48 (Ariz. Ct. App. 1970). Under the change of plans doctrine:

> A change of plans may give rise to a cause of action (1) where the circumstances are such that the change results in construction of some feature that would have caused some compensable damage not included in the original award, or (2) *where the change results in elimination of some feature which, although itself non-compensable, was considered in mitigation of some compensable element of damage.*

*Id.* at 108, 467 P.2d at 948 (emphasis added). *See also State ex rel. Herman v. Schaffer*, 105 Ariz. 478, 467 P.2d 66 (1970); *State ex rel. Herman v. Tucson Title Ins. Co.*, 101 Ariz. 415, 420 P.2d 286 (1966); *De Alfy Prop. v. Pima Cnty.*, 195 Ariz. 37, 41, 985 P.2d 522, 526 (Ariz. Ct. App. 1998) ("[R]ecovery may be had in a subsequent action where the construction plans admitted into evidence in the condemnation suit provided mitigating features as against an item of compensable damage."); *Feuerborn v. State*, 59 Wash. 2d 142, 367 P.2d 143 (1961).

[¶27.]     In *Tucson Title,* Arizona sought to acquire the landowner's property at 29th Street to create the Tucson Control Access Highway. 101 Ariz. at 416, 420 P.2d at 287. A state agent showed the landowner a map indicating that an interchange would be constructed at 29th Street, so the landowner's remaining property would have access to the Tucson Highway through the 29th Street interchange. However, after settlement of the condemnation proceeding, the state

changed its construction plans and eliminated the 29th Street interchange. The Arizona Supreme Court concluded: "While it is true that the Highway Department has the right and power to abandon or change any part of the state highway system, the state must respond in damages if it acquires property in consideration of an agreement to construct an interchange and thereafter fails to construct such interchange." *Id.* at 417, 420 P.2d at 288 (internal citation omitted).

[¶28.] We find *Filler*, *Johnson Bros.*, *Alsop*, *Olson*, and *Tucson Title* persuasive. We do so because the State designated access for the remaining Property at Exit 66 and used that designation to mitigate the original takings damages. Thereafter, the State removed that designated access causing the remaining Property to suffer a new injury for which constitutionally required compensation was never paid. We also note that the Legislature has specifically embraced the right to additional compensation when the State's construction plans mitigating initial takings compensation change causing additional takings or damage.[12]

---

12. SDCL 31-19-23(6) requires that in a so-called "quick take" condemnation proceeding, the state must file its plans setting forth in detail the "features as pertain to the adjacent landowner's access to, and means of crossing over and under the proposed highway, together with a description of any additional factors which the State . . . intends to rely upon in mitigation of damages." Thereafter, the abutting landowner is entitled "to proceed against the state or municipality for additional compensation" where there is a "substantial deviation" from any "written memoranda or agreement, plans and descriptions" filed with a declaration of taking "which amounts to an additional taking or damage." *Id.* Although these statutes were enacted shortly after the 1961 condemnation in this case, they reflect legislative intent to pay additional compensation when the State's designated right-of-way plans change. Moreover, in the past we have relied on "construction plans referred to in the Right Of Way Agreement" to determine the extent of

(continued . . .)

[¶29.] In accordance with *Filler, Johnson Bros., Alsop, Olson,* and *Tucson Title*, we hold that a landowner's compensation for loss of access may arise when: (1) property abuts a proposed controlled-access highway; (2) the state takes a portion of the property in a condemnation proceeding for the highway; (3) the state mitigates some compensable element of damage based on the state's designation of a feature of the project; (4) the state subsequently eliminates that feature; and (5) like any other claim for damages under Article VI, § 13 of the South Dakota Constitution, the landowner can prove special damages. *See Hurley*, 82 S.D. at 161, 143 N.W.2d at 725 (providing "the landowner is entitled to compensation under the taking and damaging clause of our constitution when the construction of a public improvement causes damage to property 'if the consequential injury is peculiar to the owner's land and not of a kind suffered by the public as a whole'") (quoting *State Highway Comm'n v. Bloom*, 77 S.D. 452, 461, 93 N.W.2d 572, 577 (1958)).

[¶30.] In this case, there is no dispute that: Landowners' Property has always abutted the controlled-access highway; part of the Property was taken in a condemnation proceeding in 1961 to construct the highway; the State offset compensable severance damages for the Property not taken in the original condemnation proceeding because of the interchange that the State designated; the State subsequently eliminated all access through that designated interchange; and, in the 1961 condemnation proceedings, the State indicated that it was providing a "special benefit" to the Property through its designation of access at Exit 66. We

_____

(. . . continued)
   an initial taking. *Larsen v. State*, 90 S.D. 146, 150, 238 N.W.2d 684, 686-87 (1976).

therefore agree with Landowners that the subsequent removal of that access is damage for which compensation is due. Indeed, without a right to compensation in this type of case, the State could use a particular feature of a public improvement in a condemnation as mitigation or partial compensation for the initial taking and later fail to construct the mitigating feature at all.

[¶31.] The State, however, argues that Landowners' loss of access claim was released by Landowners' predecessor in the original option agreement and deed. The State contends that subparagraph seven of the option agreement released any claim of access from adjoining real property; subparagraph five waived any access to the interstate from abutting, adjacent or adjoining lands; and subparagraphs two and three acknowledged the agreed compensation was in exchange for release of any and all claims, including claims for compensation due to the controlled-access nature of the highway. The warranty deed also stated: "'CONTROLLED ACCESS' in accordance with Chapter 155 of the 1953 Session Laws of the State of South Dakota. No access."

[¶32.] However, both the introductory clause and subparagraph three of the option indicated that the release of the condemnation claim was "by reason of the proper and legal construction, operation and maintenance of a controlled-access highway and facilities *in accordance with the plans on file in the office of the Department of Highways*" – plans explicitly designating access at Exit 66. (Emphasis added.) We have previously recognized that construction plans referred to in the right-of-way agreement may determine the nature of the property rights originally taken. *See Larsen*, 90 S.D. at 150, 238 N.W.2d at 687. Therefore, when

all relevant provisions are read together, we conclude that the deed and option agreement cannot be considered to have contracted away the constitutional right to compensation for damages resulting from the construction, operation, and maintenance of I-90 in a manner contrary to the manner specifically designated in the option agreement. Stated differently, Landowners' predecessor did not contract away the constitutional right to compensation unmitigated by the State's designation in the option agreement that it would provide indirect access at Exit 66. When all language of the documents is considered in its totality, the release clauses are best read as releasing claims of general access to I-90 rather than the right of indirect access specifically designated. As *Olson* explained, a "condemning authority may contract away its right to exercise its police powers. A subsequent change of plans, therefore, becomes compensable as a breach of contract." 12 Ariz. App. at 108, 467 P.2d at 948.

[¶33.] The State also argues that it has plenary power to change access points on controlled-access highways. The State relies on 39 Am. Jur. 2d Highways, Streets, and Bridges § 216 (2011) and 3 Nichols on Eminent Domain § 10.03[6][a], at 10-110 (3d ed. 1994). But both authorities specifically note that the plenary power to change access points does not apply to rights of access "specifically granted." 39 Am. Jur. 2d Highways, Streets, and Bridges § 216 ("Abutters do not have access rights to a limited access highway, except those specifically granted."); 3 Nichols on Eminent Domain § 10.03[6][a], at 10-110 ("Where an ordinary or conventional road is built, there may be an intent to serve abutting owners, but when a limited-access highway is established, the intent is just the opposite. No

new rights of access can arise unless they are specifically granted.") In this case access was granted. It was granted when it was designated in the option agreement and used to mitigate the constitutional damages due.

[¶34.] The State further argues that Landowners did not satisfy the second element of the compensability question, which requires proof of special damages.[13] We disagree. Landowners suffered damages that are different in kind from that sustained by the public generally. After all, there is no dispute that the State mitigated its initial compensation award in return for what it indicated was the "special benefit" only this abutting landowner would receive from the access at Exit 66. The State's recognition of a special benefit from the access in 1961 belies its current claim that the Property suffered no special damages from the removal of that access. The term special benefit is something that follows the distinction between general and special damages. *State Highway Comm'n v. Emry*, 90 S.D. 587, 596-97, 244 N.W.2d 91, 96 (1976). *See also Hurley*, 82 S.D. at 163-64, 143 N.W.2d at 725-26 (concluding that an abutting landowners' loss of highway access caused "damages [that] were different in kind and not merely in degree from that experienced by the general public and their private property right of access was taken in the constitutional sense requiring compensation to be paid therefor"). Thus, under the unique facts of this case, special damages were proven.

---

13. The State also contends that any alleged "inadequacy of consideration" suffered by Landowners' predecessor cannot now be raised "to warrant rescission of the contract." However, Landowners are not requesting rescission. They seek damages to their property under the South Dakota Constitution.

[¶35.]       The State further contends that a subsequent landowner cannot bring a cause of action for inverse condemnation based upon mitigation of a previous landowner's special benefit because a special benefit does not run with the land. In *Filler*, the special benefit of access was used to mitigate the condemnation award of the landowner's predecessor. 281 N.W.2d at 240-41. Even though it was the predecessor's compensation that was mitigated, the current landowner was permitted to pursue a cause of action for the subsequent loss of access. Similarly, in *Alsop* a landowner was found entitled to compensation if either he or his predecessor had relied on the construction plans in settling or receiving an award for the prior condemnation. 586 P.2d at 1240. Those courts reached that result because the law views the matter as a second taking or impairment of the property occurring during the subsequent owner's possession. *See Filler*, 281 N.W.2d at 241.

[¶36.]       The State finally argues that the grant of a special benefit at the time of the initial taking does not prevent the government from discontinuing use of the facility that provides that benefit to the property. *See Reichelderfer v. Quinn*, 287 U.S. 315, 53 S. Ct. 177, 77 L. Ed. 331 (1932). *Reichelderfer* was based on the theory that any damage suffered, although greater in degree, was the same in kind as that suffered by the public. *Id.* at 320, 53 S. Ct. at 179. But as previously noted, the injury to this Property caused by the removal of access is different than the inconvenience suffered by the traveling public and by other non-abutting owners whose land was not taken under these circumstances. *See Hurley*, 82 S.D. at 161, 163-64, 143 N.W.2d at 725-26. *Reichelderfer* is inapposite.

[¶37.]        "The underlying intent of the [damages] clause is to ensure that individuals are not unfairly burdened by disproportionately bearing the cost of projects intended to benefit the public generally." *DeLisio v. Alaska Super. Ct.*, 740 P.2d 437, 439 (Alaska 1987). "The tendency under our system is too often to sacrifice the individual to the community; and it seems very difficult in reason to show why the State should not pay for property which it destroys or impairs the value, as well as for what it physically takes." *Bakke v. State*, 744 P.2d 655, 657 (Alaska 1987); *Liddick v. City of Council Bluffs*, 232 Iowa 197, 218, 5 N.W.2d 361, 372-73 (1942). The facts of this case are unique. Just compensation due for an initial physical taking of abutting property was mitigated because of a designated special benefit of access the State indicated it would provide. But the State subsequently eliminated that designated access. Landowners are entitled to damages for inverse condemnation occasioned by the removal of the designated access. We need not consider Landowners' other constitutional arguments. The matter is reversed and remanded for trial on damages.

[¶38.]        GILBERTSON, Chief Justice, and KONENKAMP, and SEVERSON, Justices, and MEIERHENRY, Retired Justice, concur.

[¶39.]        WILBUR, Justice, not having been a member of the Court at the time this action was submitted to the Court, did not participate.